JOHN AMELCHENKO, PLAINTIFF-RESPONDENT, v. BOR-OUGH OF FREEHOLD, A MUNICIPAL CORPORATION, DEFENDANT-APPELLANT.

Argued April 7, 1964—Decided June 24, 1964.

542

*Mr. Robert V. Carton* argued the cause for defendant-appellant (*Messrs. Carton, Nary, Wilt & Arvanitis,* attorneys).

*Mr. Thomas F. Shebell, Jr.* argued the cause for plaintiff-respondent (*Mr. Thomas F. Shebell,* attorney).

The opinion of the court was delivered by

FRANCIS, J. The Borough of Freehold provided a parking lot in the heart of its business section for use of the public. The land used for the purpose, approximately three and one-half acres, had been acquired out of general funds. It had a capacity of about 470 cars. There were no meters and no charge was made for the privilege of parking. On Thursday, January 19, 1961, between 9:00 and 10:00 A. M. snow began to fall, the storm lasting for 24 hours. Estimates of the extent of the fall ranged from six inches to 12 inches, and the testimony shows that it was accompanied by some drifting. The weather bureau reports noted a four inch precipitation on January 19, another 6.4 inches on January 20, and an accumulation of 10 inches on the ground on January 20 and 21. The temperatures ranged for the three days from 20° on Thursday, to 10° on Friday and 0° on Saturday. For reasons to be set forth, the borough had been unable to remove any of the snow from the parking lot by Saturday, January 21, when the mishap occurred which produced this damage action.

On Saturday around 6:30 P. M., about 33 hours after the storm ended, plaintiff, John Amelchenko, parked his car in the borough's lot. The snow which covered the area was rutted in places where automobiles had driven or parked. The extent of the rutting does not appear. Where there were no ruts the snow was in its natural state, with some unevenness in the surface, apparently due to the drifting. In addition, because of the cold weather, a crust had formed on top of the snow. When stepped on at some places the crust would sustain the walker, at others his feet would go through into the deep snow. Amelchenko walked out of the lot from his car to

the public street without mishap. On the way back to the car at about 10:30 P. M., while walking over the uneven ice-crusted snow, he slipped and fell, sustaining injuries on account of which he brought this suit against the borough.

At the trial, after the evidence of both parties had been introduced, the court granted defendant's motion for judgment on the ground that no negligence had been shown on the part of the borough. Plaintiff appealed to the Appellate Division which found the proof sufficient to raise a factual issue as to whether the borough was negligent in failing to clear the parking lot of snow or to clear walkways for parkers prior to the time of plaintiff's fall. Consequently, the action of the trial court was reversed and the cause was remanded for a new trial. 81 *N. J. Super.* 289 (*App. Div.* 1963).

█ The borough appealed to this Court under *R. R.* 1:2–1(a) alleging that the adverse result in the Appellate Division created a constitutional question which justified direct appeal. The argument is that *Article* IV, § VII, *paragraph* 11 of the *New Jersey Constitution* which requires a liberal construction of statutes concerning municipalities, was violated because the Appellate Division's declaration of the inapplicability of *R. S.* 40:9–2 (a law concerning municipal immunity from liability in certain situations), represents a narrow construction of the statute. The contention raises no substantial or colorable constitutional issue within the meaning of *R. R.* 1:2–1(a), and our jurisdiction should not have been invoked by appeal. A petition for certification was filed also and although not pursued, we have decided to review the case as if certification had been granted.

The basic complaint against defendant is that it was negligent in failing to remove the snow from its public parking lot, which failure left a condition dangerous to invitees lawfully walking in the lot. Neither the complaint nor the pretrial order charged negligence in not closing off the lot until the snow was removed. The borough not only denied negligence but asserted immunity from liability under *R. S.* 40:9–2 which provides as follows:

546

"No municipality or county shall be liable for injury to the person from the use of any public grounds, buildings or structures, any law to the contrary notwithstanding." *L*. 1933, *c*. 460.

There is no need to consider the reasons advanced by the trial court or the Appellate Division for treating *R. S*. 40:9–2 as inapplicable, *i. e.*, that operation of a municipal parking lot is a proprietary and not a governmental function. 81 *N. J. Super*., at *pp*. 293, 294. Clearly the statute is not relevant for a more basic reason. The Legislature has dealt specifically with municipal liability for injuries to members of the public arising out of parking lot operation or maintenance. In 1942, *N. J. S. A*. 40:60–25.5 was adopted. It says:

"No municipality shall, by virtue of its operation or maintenance of any such public parking area, be liable in damages to any person, * * * for the loss of or for any damage to any vehicle while parked in any such area, or while entering or leaving the same, for the loss of or damage to any article or articles from any vehicle, or for any personal injury which may be sustained while in or upon any such area or the entrances thereto or exits therefrom; *provided, however*, that this provision shall not be so construed or applied as to relieve the municipality from any liability which may be imposed upon it by law for the negligence of its agents, servants or employees." *L*. 1942, *c*. 138.

■ The portion of the act preceding the proviso is unclear. It may be the legislative intention was to immunize the municipality against claims for damages or injuries inflicted by patrons or other invitees using the parking facility. That question is not before us. But it is plain from the proviso that the Legislature intended to recognize liability for injuries or damage negligently inflicted upon invitees on the premises by agents, servants or employees of the municipality itself. And we take the unqualified language to signify such liability whether the parking lot is deemed a governmental or a proprietary function.

■ Thus we come to the ultimate question whether the proof adduced at the trial established any negligence on the part of the borough or its agents or employees in the operation of the parking lot which proximately produced plain-

tiff's accident. In connection with application of the doctrine of *respondeat superior,* no longer is there any differentiation between a municipality and an ordinary employer. *McAndrew v. Mularchuk,* 33 *N. J.* 172, 190–193 (1960).

According to the 1960 census, the Borough of Freehold had a population of 9,140. It has approximately 30 miles of streets. For snow removal purposes it had three trucks with snowplow attachments, one grader with a snowplow on it and a front-end loader. A standard procedure to be followed in snowstorms had been established. In the early stages the trucks put sand and salt on the streets. If the storm continues and the snow deepens so the efficiency of the sand and salt is minimized, the plows are hooked up to the trucks, and they, the grader with the plow on it, and the front-end loader are brought into use. The main streets are cleared first to permit the movement of emergency vehicles, if necessary, and to keep traffic moving. Plowing of the arterial streets follows and then the remaining streets are cleared. When the streets are usable, attention is turned to the municipal parking lots which are plowed.

On the occasion of the snowstorm under discussion, the usual practice was pursued. The uncontradicted evidence reveals that on January 19 from the beginning of the storm until midnight the 14 men in the street department worked on the streets with the necessary equipment. On January 20, the same men worked on the streets in shifts for the entire 24 hours from midnight to midnight, each man averaging 12 hours. On January 21, again they worked around the clock clearing the streets, each man averaging the same time. It should be noted again that the snowfall was accompanied by drifting which, in some of the more open places, piled the snow two to four feet deep. Also, the temperature had dropped from 20° above zero on January 19 to 10° above on the 20th and to zero on the 21st. On Sunday, January 22, 11 of the men continued their work on the streets for 10 hours, in a temperature of one degree below zero. As the result of the effort to perform what was considered the primary

public obligation to plow and clear the streets, the men had not reached the secondary phase of their snowstorm procedure, the clearing of the parking areas.

The parking lot where plaintiff fell has five entrances. Although no plowing had been done, a fact which was obvious, the evidence indicates some motorists drove into and used the lot. How many did so or when the use began with respect to the storm and its cessation does not appear. As we have said, prior to plaintiff's fall the use had produced some ruts and churned snow, the extent of which was not shown. The cold weather and probably the drifting had caused unevenness and a frozen crusting on the remainder of the area.

As plaintiff drove into the parking area at 6:30 P. M. on January 21, he observed with the aid of his car lights that the snow had not been plowed. He parked his car and walked to the street through a wide driveway which runs alongside the Acme market building. While making his way to the street he noticed some automobile tracks in the snow and the unevenness of the surface. He became aware also of the icy crust on the snow and he experienced breaking through into the soft snow in some places. The situation was the same at 10:30 P. M. when he undertook to return to his car by the same driveway. As he stepped on one of the uneven places of snow or ice, he slipped and fell in the lot about 15 feet from the rear of the Acme building. He did not suggest the unevenness was due to automobile ruts or to any condition other than the way in which the snow came to rest naturally.

Photographs put in evidence showed electric light poles at various places in the lot. One photograph reveals such a pole just to the rear of what was called the Acme market building. A light suspended by a metal arm extending from the pole marks a wide driveway running from the lot alongside the market out to the public street. It seems plain from the record the light was on at the time of the accident. Amelchenko said the light condition was dim where he fell. There is no positive proof the lights in other parts of the lot were not in operation that evening. No proof was offered to establish

that the condition of light in the entire parking area was any different on this night from any other night, or was any different from the standard method of lighting followed generally in municipal or privately-operated parking lots. Nor did plaintiff say the light condition was such that he could not see where he was stepping as he walked on the snow.

What was the nature of the duty owed by the borough to the plaintiff at the time and place of his fall? The parking lot was a free facility provided for the convenience of the public as a matter of public service. In addition, in these days of heavily-traveled streets around the centers and business areas of municipalities, such off-street parking areas plainly serve the public purpose of alleviating traffic congestion and furthering the usability of the municipal roadways. *Camden Plaza Parking, Inc. v. City of Camden*, 16 *N. J.* 150 (1954). This is not to say no duty of care toward the users of a free parking facility is imposed upon a municipality affording such service. But it is not an insurer of their safety. The duty, especially regarding snow removal following a storm, must be measured by a number of factors. In applying the measure it is necessary to do so with an understanding of the nature of the problem facing municipalities. Instantaneous removal in climates such as ours is neither required nor feasible. Much depends upon the size of the task the particular municipality is called upon to face, the severity of the storm, the miles of streets and number of public places to be cleared, the amount of equipment provided and the personnel made available for the purpose, and the practicability and efficiency of the efforts to meet the problem. Moreover, when a street department is established, obviously the governing body determines the number of employees to be assigned to it and the amount of snow removal equipment to be purchased and made available for ordinary municipal needs. That determination is a matter of judgment committed under our system of government to the local authority and it should not be interfered with by the courts in a tort damage suit.

■ Moreover, establishment of a general method of handling snowstorms is a matter of planning. The decision adopting a procedure regulating when, where and in what order of priority the equipment and personnel are to be used in dealing with them is legislative or governmental in nature. Such decisions cannot be subject to review in tort suits for damages, for this would take the ultimate decision-making authority away from those who are responsible politically for making the decisions. The extent and quality of governmental service to be furnished is a basic governmental policy decision. Public officials must be free to determine these questions without fear of liability either for themselves or for the public entity they represent. It cannot be a tort for government to govern. *Solinsky v. City of Wilkes-Barre,* 375 Pa. 87, 99 *A. 2d* 570 (*Sup. Ct.* 1953) ; *Beebe v. City of Philadelphia,* 312 *Pa.* 214, 167 *A.* 570 (*Sup. Ct.* 1933) ; and, see *Weiss v. Fote,* 7 *N. Y. 2d* 579, 200 *N. Y. S. 2d* 409, 167 *N. E. 2d* 63 (*Ct. App.* 1960) ; *Haney v. City of Lexington,* 200 *S. W. 2d* 726 (*Ky. Ct. App.,* May 22, 1964) ; 3 *Davis, Administrative Law,* §§ 25.13, 25.17, *pp.* 488, 500 (1958) ; 1963 *California Law Revision Comm'n. Report:* "Tort Liability of Public Entities and Public Employees," cited in *Davis, supra,* 1963 pocket part, § 25.17; "Charitable and Governmental Immunity," Address by Chief Justice Weintraub, 14th Annual Meeting of the Conference of Chief Justices, August 2, 1962, *p.* 6.

The New York Court of Appeals gave clear voice to this doctrine in *Weiss v. Fote, supra,* when it said:

"To accept a jury's verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of the governmental body which originally considered and passed on the matter would be to obstruct normal governmental operations and to place in inexpert hands what the Legislature has seen fit to intrust to experts."

Recognition of that conclusion "serves only to give expression to the important and continuing need to preserve the pattern of distribution of governmental functions prescribed by con-

stitution and statute." 200 *N. Y. S. 2d*, at *p.* 413, 167 *N. E. 2d*, at *p.* 66.

▇▇ It may be recognized as a basic proposition that the borough was under a duty to use ordinary care to remove the snow from the parking lot in question within a reasonable time after the termination of the storm. An alleged breach of the duty, however, must be tested by the conditions set forth above. The conduct should not be adjudged negligent unless it can be said fairly that the municipality did not act with reasonable care in utilizing its established snow removal procedure in light of the particular situation with which it was faced. See 2 *Harper and James, Law of Torts*, § 29.7, *p.* 1631, *fn.* 32 (1956). The appraisal of the conduct must be made with some tolerance of the efforts to cope with an emergency which was nature's creation and not of the municipality's making. *De Crosta v. New Haven*, 119 *Conn.* 344, 347, 176 *A.* 268, 270 (*Sup. Ct. Err.* 1935). And an element which plays a part in stimulating that tolerance is the knowledge that there are certain risks inherent in the presence of snow on a public way which are obvious to pedestrians and which naturally put them on guard.

▇ Under the common law in New Jersey there is no duty on the part of a municipality to clear snow from public sidewalks. In other states where the law imposes an obligation to use ordinary care to keep such ways reasonably safe for pedestrian travel, the cases by analogy furnish some guideline for the rule to be applied in the present case. For example, in those jurisdictions where it appears that snow on a public sidewalk has created a dangerous condition (as distinguished from its mere presence in its original and natural state, 63 *C. J. S. Municipal Corporations* § 813, *p.* 143 (1950)), liability does not come into existence until the municipality has failed to remedy it within a reasonable time after actual or constructive notice of the condition. *Cusick v. City of New Haven*, 148 *Conn.* 548, 172 *A.* 2d 905 (*Sup. Ct. Err.* 1961); *Solinsky v. City of Wilkes-Barre, supra; Wadlund v. City of Hartford*, 139 *Conn.* 169, 91 *A.* 2d 10 (*Sup. Ct. Err.*

1952); *Speakman v. Dodge City*, 137 *Kans.* 823, 22 *P.* 2d 485 (*Sup. Ct.* 1933); *Williams v. City of New York*, 214 *N. Y.* 259, 108 *N. E.* 448 (*Ct. App.* 1915); *Bull v. City of Spokane*, 46 *Wash.* 237, 89 *P.* 555, 13 *L. R. A., N. S.*, 1105 (*Sup. Ct.* 1907).

In *Beebe v. City of Philadelphia, supra,* a severe snowstorm occurred about 6:00 A. M. on Saturday, January 28, 1928. It continued until about 4:00 A. M. Sunday and reached a depth of about 10½ inches. There were snow flurries on Monday night between 10:50 P. M. and midnight. On Tuesday the weather cleared. The temperature was below freezing during the entire period with the exception of Tuesday when it reached 34° at 3:00 P. M. The plaintiff fell on the sidewalk on Tuesday at 6:00 P. M. The snow had not been removed and the walk was covered with hills and ridges from two inches to six inches high. Plaintiff claimed the city was negligent in failing after actual or constructive notice to remedy the condition. The court said the city could not be charged with notice of the hills and ridges for much more than 24 hours, which was not sufficient under the circumstances to warrant a finding of negligence. It declared that considering the size of the city, the severity of the storm, a jury should not be permitted to substitute its judgment for that of the city authorities in selecting the sections of the sidewalk which would receive first attention.

In *Wadlund v. City of Hartford, supra,* on the basis of weather bureau reports, the Supreme Court of Errors pointed out that the maximum possible period the ice and snow which allegedly caused plaintiff's fall could have been on the sidewalk was 29 hours. And it suggested the evidence indicated strongly that probably the time was shorter. In vacating the plaintiff's verdict the court said the finding that the city was chargeable with constructive notice was unwarranted, and that "in our climate, considerable latitude should be allowed municipalities in cases of this character."

In *Solinsky v. City of Wilkes-Barre, supra,* the Supreme Court of Pennsylvania said, "To remove the snow from all the

streets of a city the size of Wilkes-Barre, and within a few days after a normal snow fall, is obviously impossible." 99 *A. 2d,* at *p.* 571. "Even had it been practical or possible to have removed the snow from this street immediately after its fall, the city would also be required to remove the snow from all its other streets. This relatively infrequently traveled one block lane certainly would not have taken precedence over main streets of this busy city. * * * A jury will not be permitted to substitute its judgment for that of the city in selecting streets first to be cleared." 99 *A. 2d,* at *pp.* 572, 573.

In *Frohlich v. City of New Haven,* 116 *Conn.* 74, 163 *A.* 463 (*Sup. Ct. Err.* 1932), it appeared that three inches of snow fell on February 7, 1931 between 4:50 P. M. and 4:00 A. M. on February 8. Between 6:00 A. M. and 9:00 P. M. on February 8 there was a sleet and rainstorm, the water freezing as it came down, forming a substantial coating of ice on the walks. The temperature remained below freezing during the night of February 8 until 10:00 A. M. on February 9 when plaintiff slipped and was injured. Her accident occurred 13 hours after the end of the storm. In deciding for the defendant as a matter of law, the court commented that the municipality could not be held liable,

"* * * particularly * * * in view of the uncontradicted evidence of the duration, nature, and effects of the successive storms of the 7th and 8th, the size of the city and the mileage of its streets and walks, the magnitude of the task confronting the city in cleaning them, and the prompt employment of all available resources and assistance in coping with the situation." 163 *A.,* at *p.* 464.

In *Nibarger v. City of Seattle,* 53 *Wash. 2d* 228, 332 *P. 2d* 463 (*Sup. Ct.* 1958), the evidence showed a heavy intermittent snow commenced on January 15 and continued to January 18. The sidewalk where plaintiff fell became ridged and lumped with ice and snow from pedestrian traffic. The fall occurred 15 hours after cessation of the storm. The court held the period inadequate to charge the city with constructive notice of the dangerous condition, or to justify a finding of

negligence based on failure to remedy the condition before plaintiff's accident. In doing so the court noted that from January 16 to January 19 the city had crews working clearing snow and sanding streets on a 24-hour basis in two 12-hour shifts including Saturday and Sunday. And, see *Yonki v. New York*, 276 *App. Div.* 407, 95 *N. Y. S.* 2d 80 (1*st Dept.* 1950), appeal dismissed 303 *N. Y.* 852, 104 *N. E.* 2d 488 (*Ct. App.* 1952); *Rapoport v. New York*, 281 *App. Div.* 33, 117 *N. Y. S.* 2d 408 (1*st Dept.* 1952), affirmed 306 *N. Y.* 636, 116 *N. E.* 2d 244 (*Ct. App.* 1953); *Goldman v. New York*, 264 *App. Div.* 740, 34 *N. Y. S.* 2d 428 (*App. Div.* 1942); *Goldstein v. Dattelbaum*, 258 *App. Div.* 812, 15 *N. Y. S.* 2d 1015 (*App. Div.* 1939); Annotation, 39 *A. L. R.* 2d 782 (1955).

No one would question that the borough was entitled to reasonable time after the end of the storm to remove the snow from the parking lot. Nor can it be doubted that the permissible period for the purpose depended upon all of the circumstances under which it was called upon to act. And the cases cited above reveal the awareness of the courts of the difficult problem facing municipalities with respect to snow removal, as well as their views as to what would be considered a reasonable time as a matter of law for the purposes of removal.

On the evidence adduced by the plaintiff, plainly the actual cause of his fall was a product of nature—the crusted snow on the parking lot. It is equally clear from the uncontradicted proof that plaintiff failed to show that the borough was guilty of negligence in the manner in which it executed its regular procedure for snow removal. A reading of the record makes the conclusion inescapable that the borough was devoting itself with reasonable care to remedying the community problems created by the storm. The proof showed that the street department workmen and the borough equipment had been devoted around the clock to the street clearing task throughout the period of the snowstorm and

until the plaintiff parked his car in the untouched free parking lot about 33 hours later, and until his subsequent fall.

As we have said, determination as to the priority to be given to the clearing of the public streets (and the procedure regularly established in that regard) represents the exercise of judgment on a governmental matter committed by law to the municipal authority. On the proof presented here a jury cannot be allowed to substitute its decision for that of the municipality. The same is true of the local government judgment as to the *quantum* of equipment to be purchased or made available for snow removal purposes, and as to the number of men required to staff the street department. We cannot subscribe to the view adopted by the Appellate Division that such problems were for jury consideration. In our judgment, under all the circumstances, it must be said as a matter of law that the borough was not shown to have acted negligently in failing to reach and remedy the snow condition in the lot prior to plaintiff's mishap.

Accordingly, the judgment of the Appellate Division is reversed and the cause is remanded to the Law Division for the entry of judgment for the defendant.

HANEMAN, J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, HALL, SCHETTINO and HANEMAN—6.

*For affirmance*—None.