99 N.J. Super. 405 (1968)
240 A.2d 177
FRANK H. HUGHES, PLAINTIFF-APPELLANT,
v.
THE COUNTY OF BURLINGTON, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 18, 1967.
Decided February 26, 1968.
*406 Before Judges CONFORD, COLLESTER and LABRECQUE.
*407 Mr. James M. Davis, Jr. argued the cause for appellant (Messrs. Powell and Davis, attorneys).
Mr. Roy D. Cummins argued the cause for respondent (Messrs. Orlando & Cummins, attorneys).
The opinion of the court was delivered by CONFORD, S.J.A.D.
Plaintiff suffered serious injuries on the early morning of November 15, 1963 when, while standing between his car and that of defendant Cotten on the South Pemberton Road in Burlington County, a third car driven by defendant Weaver struck the rear of the Cotten car with such violence as to jam it against that of plaintiff, crushing plaintiff's legs in the process. Plaintiff brought a negligence action against the drivers of all the other vehicles involved, including one Brown, whose role in the accident will be described hereinafter.
The incidence of the present appeal arises from the fact that plaintiff also joined the County of Burlington as a defendant, asserting that its negligent construction of the highway was a contributing factor in the accident and his resulting injuries.
The jury returned a verdict of $250,000 against three individual defendants but found no cause of action as against the county. This appeal thus presents only the matter of the validity of the judgment absolving the county. The practicalities of the matter are that the county had insurance liability coverage of $500,000 for injury to one person.
The county had in 1959 converted the three-mile highway segment on which this accident occurred, which is in a rural area, from a two-lane road with conventional shoulders to a four-lane highway without shoulders. There was no increase of the 66-foot right-of-way. Each paved lane was 11 feet wide. On the south side of this east-west highway, at or near the place of the accident, the paved lanes of the roadway were bordered by a grassy "berm" within the right-of-way, elevated variably from a few to as much as ten inches *408 above the pavement. There was some evidence it could be mounted by and sustain the weight of an automobile, but it is also inferable from the proofs that the driver of a car would not ordinarily regard it as a suitable place to park it when disabled or to drive onto in continuous motion from the paved roadway in order to pass a stopped car.
An understanding of plaintiff's claim of causal relation between the assertedly negligent omission of shoulders in the construction of the highway and the occurrence of his injuries requires further details as to the accident.
It all began when defendant Brown stopped his car astride the white line separating the two eastbound lanes of the highway and let it stand that way, unlighted, while he slept or reclined on the front seat or floor. Plaintiff Hughes and his wife came along in their car driving easterly and were able to stop just short of Brown's car. There was insufficient room to pass Brown's car on the right, and westbound traffic had prevented passing it on the left. Cotten, who with his wife had been the Hughes' guest at a lodge-dance from which they were separately returning home, came along in his car and struck the Hughes' car lightly in the rear. Hughes and Cotten went to investigate the Brown car and tried to detain Brown, but he drove away. At this point the Hughes and Cotten cars were on the extreme right side of the paved roadway. Hughes was standing between the cars investigating a noise in the Cotten car apparently the result of the impact. Weaver, driving easterly, and apparently at some speed, testified that he could not pass the Cotten car on the right at the time he first saw its lights because of the elevation along the south edge of the roadway, and that before he could turn to the left he struck the Cotten vehicle, with the tragic result to Hughes noted above.
At the trial two engineering experts testified on each side (i.e., plaintiff and county), plaintiff's in support of the view that the absence of shoulders was a departure from accepted standards in the construction of such a road, defendant's to the contrary. The trial judge gave the jury the issue of the *409 county's liability on the classic criterion of affirmative wrongdoing in the performance of a governmental function. Hartman v. City of Brigantine, 42 N.J. Super. 247 (App. Div. 1956), affirmed 23 N.J. 530 (1957).
Plaintiff's appeal raises principally these grounds: (a) there was error in submitting the question of the liability of the county on the criterion of governmental immunity except for active wrongdoing, in view of the new approach to that question of law taken in B.W. King, Inc. v. Town of West New York, 49 N.J. 318, 324-325 (1967) (decided after this case was tried); that the basis of liability should simply be negligence and proximate cause, as in the case of any other tortfeasor; and (b) no defense of governmental immunity should have been permitted to be raised by defendant, because the county was covered by a public liability insurance policy which contained an indorsement precluding the insurer from raising the defense of governmental immunity except upon written request of the county.

I
We have concluded that a resolution of the first issue stated last above becomes unnecessary because the ultimate result of nonliability of the county in this situation is correct as a matter of law, in that the decision to omit conventional shoulders in building the highway falls within the area of nonactionable exercise of governmental discretion, as developed in such recent cases as Visidor Corp. v. Borough of Cliffside Park, 48 N.J. 214, 221-223 (1966), certiorari denied 386 U.S. 972, 87 S.Ct. 1166, 18 L Ed.2d 132 (1967); Hoy v. Capelli, 48 N.J. 81, 89-91 (1966); and Fitzgerald v. Palmer, 47 N.J. 106 (1966). The county made this point at the trial on a number of appropriate occasions, but its position was rejected by the trial court. The contention is renewed here as an alternative ground for sustaining the judgment in favor of the county, and we are in agreement with it, for reasons which follow.
*410 According to testimony adduced on behalf of the county, which was substantially unrefuted, the reconstruction of this highway in 1959 was undertaken pursuant to the federal aid secondary roads program (F.A.S.) in order to secure the substantial federal financial aid available thereunder in defraying the costs involved. There is a set of standards, minimum and optional above minimum, promulgated by the United States Bureau of Public Roads, which state and local authorities are required to follow in order to obtain the benefits of federal aid. This particular project was submitted for approval under the category of four-lane rural highways with an average hourly traffic volume of 500 to 1000. There is proof in the case that a traffic survey of this road in 1957 showed an average hourly volume of from 355 to 500. Both the present county engineer and county expert witness Williams qualified as experts on standards of highway construction on behalf of defendant and testified that the plans for and construction of this highway as actually executed were in conformance with the minimum requirements of the United States Bureau of Public Roads for qualification for federal aid for secondary roads like this one. (There are different federal standards for roads built under the federal aid primary road program.) Specifically, conventional hard-type shoulders are not required under those standards. Williams, who has an impressive record in the field of highway safety engineering, gave it as his opinion that the construction of this highway conformed with good and accepted engineering practices in relation to roads of this type, size and traffic volume in New Jersey and elsewhere. It was further his opinion that the road was reasonably safe. He explained his conclusions, but this need not be here detailed. Subsidiary to his expert opinion testimony, Williams testified that automobiles could be driven (he had done so) onto the grassy berm from the paved highway in the general location of the accident and parked there.
It was also established that engineering officials of the county and state highway departments had endorsed their *411 approval of the plans for the reconstruction of the road pursuant to federal aid requirements.
Plaintiff adduced the testimony of two engineering experts qualified as to knowledge of highway construction standards. Both testified that a rural road of this general description was required under recognized engineering standards to have standard hard shoulders merging into the paved highway for the reason that highway safety called for such facilities for the emergency use of disabled vehicles. However, neither of plaintiff's experts denied that this highway met minimum standards for construction of four-lane rural highways of average hourly volume of 500-1000 or less under the federal aid secondary road program.
The cases cited above make it clear that there is an area of action or inaction arising from the exercise of governmental discretion in the administration of public affairs which is free from attack as tortious because assertedly involving a risk of harm or loss to individual members of the community. The rule of law thus evolved is based on the rationale that otherwise "a judge or jury could review the policy or political decisions involved" and thus "in effect [take] over the responsibility and power" of the legislative and executive branches. Fitzgerald v. Palmer, supra (47 N.J., at p. 110). See also Amelchenko v. Freehold Borough, 42 N.J. 541, 550 (1964).
Further, and here pointedly illustrative of the principle involved, is Weiss v. Fote, 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (Ct. App. 1960), motion for reargument denied 8 N.Y.2d 934, 204 N.Y.S.2d 1025, 168 N.E.2d 857 (Ct. App. 1960), which concerned an intersection collision allegedly caused by defendant city's negligent design of "clearance interval" between turning of traffic lights for east-west and north-south traffic. The New York court held that immunity obtained, for defendant had met the prerequisites of the application of the rule by conducting a study of clearance intervals before its final determination; experts had advised defendant that a four-second interval *412 between the two green lights was sufficiently long, albeit a longer interval would certainly have produced safer highway traffic conditions. Speaking of the application of this relatively new concept of immunity as to highway design determinations by governmental units, the court said:
"In the area of highway safety, at least, it has long been the settled view, and an eminently justifiable one, that courts should not be permitted to review determinations of governmental planning bodies under the guise of allowing them to be challenged in negligence suits; something more than a mere choice between conflicting opinions of experts is required before the State or one of its subdivisions may be charged with a failure to discharge its duty to plan highways for the safety of the traveling public." (200 N.Y.S.2d, at p. 415, 167 N.E.2d, at p. 67)
Accord with Weiss, supra, Raisanen v. City of Milwaukee, 35 Wis.2d 504, 151 N.W.2d 129, 134 (Sup. Ct. 1967). And in Pelloat v. State, Through Department of Highways, 198 So.2d 674 (La. Ct. App. 1967), it was determined that the government's decision to install small rather than large traffic signs at the intersection where plaintiff's accident occurred was protected by "discretionary act" immunity; plaintiff's injuries went uncompensated:
"If the signing of the highways is a science, and the proper or improper signing of the highways is determined on a scientific basis, * * * then certainly the department cannot be convicted of committing a negligent act or omission simply because perchance some one * * * guessed that certain controls should be installed. * * * There is a sound discretion vested in the Department; it is a matter of judgment as to what is or is not required to accomplish the adequate signing." (at pp. 682-683)
Immunity was declared in Natina v. Westchester County Park Commission, 49 Misc.2d 573, 268 N.Y.S.2d 414 (Sup. Ct. 1966) (dictum), and Warda v. State, 45 Misc.2d 385, 256 N.Y.S.2d 1007 (Ct. Claims 1964), both concerning attempts to predicate liability on the defendants' failure to erect median barriers on highways. In accord, as *413 to design errors in highway grading: City of Valparaiso v. Adams, 123 Ind. 250, 24 N.E. 107 (Sup. Ct. 1890).
In attempting to meet this problem plaintiff stresses the language we underscore from the following expression in Fitzgerald v. Palmer, supra (47 N.J., at pp. 109-110):
"A private entrepreneur may readily be held for negligent omissions within the chosen ambit of his activity. But the area within which government has the power to act for the public good is almost without limit, and the State has no duty to do everything that might be done. Rather there is a political discretion as to what ought to be done, as to priorities, and as to how much should be raised by taxes or borrowed to that end. If government does act, then, when it acts in a manner short of ordinary prudence, liability could be judged as in the case of a private party. So if a road were constructed of a design imperiling the user, the issue of fault would present no novel problem. But whether a road should have four or six or eight lanes, or there should be dividers, or circles or jughandles for turns, or traffic lights, or traffic policemen, or a speed limit of 50 or 60 miles per hour  such matters involve discretion and revenue and are committed to the judgment of the legislative and executive branches." (Emphasis added)
We do not agree that the underscored language necessarily brings the instant situation within the court's rationale, particularly when the case is read in context with the other decisions of the Supreme Court cited above. Illustrative of kinds of matters not falling within the purview of "[construction] of a design imperiling the user" are the six examples following immediately thereafter in the quoted excerpt. All of these are seen to be subjects in relation to which the governing authority exercises considered judgment and discretion (whether denominated administrative or legislative) in making its determination. And most characteristically the amount of money or other resources available for and deemed prudent for expenditure in relation to the subject in question is a relevant, sometimes controlling, element of consideration for the governmental agency concerned ("how much should be raised by taxes or borrowed to that end," 47 N.J., at p. 109). See also Amelchenko v. Freehold Borough, supra (42 N.J., at p. 549).
*414 Before us here is a case in which fiscal considerations were obviously significant, to say the least. Obtaining federal aid was the apparently controlling factor, and while such aid for this road did not preclude standard shoulders, it did not require them. There was testimony that other comparable roads in Burlington County have been recently built without shoulders. As seen above, there are two expert views as to the reasonable necessity in terms of engineering standards of shoulders for this particular highway. Such shoulders, perhaps requiring an increased width of right-of-way, would presumably have cost the county substantially more money. We are clear the decision as to whether or not to have them was a duly considered one, reposing in the discretionary judgment of the governing authority and free  in the specific factual context of this particular case  from collateral attack by tort suit under the principles expounded in the cases cited above.

II
We do not agree with the plaintiff's argument that the existence of the liability insurance coverage of the county precludes the defense of governmental immunity being raised on its behalf by the attorney engaged by the carrier to defend the action. Certainly the procurement by a governmental unit of liability insurance does not of itself effect a waiver of whatever governmental immunity from suit would otherwise prevail. Zapf v. Bd. of Chosen Freeholders, Middlesex County, 87 N.J. Super. 426, 429 (App. Div. 1965), certif. denied 45 N.J. 586 (1965). But plaintiff says this case is different because the insurance company contracted not to raise the defense of immunity unless requested to do so by the county. It questions whether an authorized request was ever made.
There are troublesome questions as to the timeliness and adequacy of the motion raising this issue at trial level and as to whether, in any event, its proper resolution on the merits would not have first required bringing in the insurer *415 as a party, the separate representation of the county on the contract issue by its own counsel, in view of possible conflicts or differences in interest, whether as to parties or counsel,[1]cf. Williams v. Bituminous Casualty Corporation, 51 N.J. 146 (1968), and the presentation of the issue for adjudication separate and independent of the tort action proper (e.g., by action for declaratory judgment). Moreover, significant side-issues of public policy lurk in the shadows of the question raised, see Annot. 68 A.L.R.2d 1437, 1445-47; they have not been adequately argued; and this appeal is not the appropriate procedural vehicle in which to resolve them.
Suffice it here to say that in the context of the procedural posture of the matter below and here, the absence of the insurer as a party, and in the light of the apparent admission by plaintiff of the truth of defendant's representation to the court that the county attorney authorized the attorney of record to assert the immunity defense at trial,[2] we see no basis for withholding affirmance of the judgment on the merits of the tort immunity issue expounded above.
Judgment affirmed.
NOTES
[1] At all times below when the point was being argued the attorney of record for defendant made it clear he was not appearing for the insurance company or representing its separate interest in respect of the insurance contract but was authorized only to appear to defend the tort action as such. He said that otherwise he would be in a position of conflict of interest between the county and the insurer.
[2] It may be observed that a clause similar to that in the instant policy has been held to permit the insurer's attorney to raise the defense of municipal immunity if so authorized by the municipal attorney. Coste v. City of Superior, 343 F.2d 100 (7 Cir. 1965).