JOSEPH COSTA, GENERAL ADMINISTRATOR AND ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATES OF EDWARD J. FLOCCO, JR., AND PHYLLIS FLOCCO, PLAINTIFF-APPELLANT, v. ALBERT J. JOSEY, DEFENDANT, AND STATE OF NEW JERSEY, DEPARTMENT OF TRANSPORTATION, DEFENDANT-RESPONDENT.

Argued December 11, 1979—Decided May 13, 1980.

*Joseph T. Afflitto* argued the cause for appellant (*Diamond, Diamond* and *Afflitto,* attorneys).

*Stephen Skillman,* Assistant Attorney General, argued the cause for respondent (*John J. Degnan,* Attorney General of New Jersey, attorney; *Erminie L. Conley,* Deputy Attorney General, of counsel; *Thomas F. Marshall,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

SCHREIBER, J.

Joseph Costa, as general administrator and administrator *ad prosequendum* of the estates of Edward J. Flocco, Jr. and his wife Phyllis Flocco, instituted a wrongful death action against the New Jersey Department of Transportation (Department). He charged the Department with having negligently maintained and repaired the center barrier separating the eastbound and westbound traffic on Route 4 in Teaneck, N.J., so that a dangerous condition existed in the roadway. He alleged that as a result the vehicle of the codefendant Albert J. Josey crossed over the barrier and collided with the Floccos' car causing their deaths.

The trial court granted the Department's motion for summary judgment, holding defendant immune under *N.J.S.A.* 59:4–6 of

the New Jersey Tort Claims Act. The Appellate Division affirmed. 160 *N.J.Super.* 1 (App.Div.1978). We granted plaintiff's petition for certification. 78 *N.J.* 335 (1978). The members of the Court being equally divided, the judgment was affirmed. 79 *N.J.* 535 (1979). We granted plaintiff's petition for rehearing and heard reargument. 81 *N.J.* 294 (1979). We now reverse essentially for the reasons stated in the dissenting opinion. 79 *N.J.* at 536.

In considering the Department's motion for summary judgment, all parties have assumed (1) that the dividing barrier in the roadway was in a dangerous condition at the time of the injury; (2) that the dangerous condition created a reasonably foreseeable risk of the kind of injury which occurred; (3) that the Department had notice of the dangerous condition a sufficient time prior to the injury to have taken measures to correct it, and (4) that the failure to take such action was palpably unreasonable. See *N.J.S.A.* 59:4–2. The Department contends that despite the hazardous condition of its road it is immune from responsibility under *N.J.S.A.* 59:4–6. That section immunizes a public entity from liability for an injury caused by the plan or design of public property "either in its original construction or any improvement thereto," where the plan or design has been approved in advance of construction by a public employee exercising discretionary authority to give such approval.

The Department's defense is that the initial design contemplated that the divider would be lowered by subsequent resurfacing of the road. We agree with the conclusion in the dissenting opinion, 79 *N.J.* at 542–543, that there are material factual disputes over whether the original plan or design of the road contemplated that resurfacing the pavement would reduce the height of the dividing barrier and cover its lower part. The Department relies principally on the affidavit of James Schuyler, containing his recollections of conferences held in 1955, to determine why the bottom four inches of the barrier were

designed as they were. Reliance upon an affidavit reflecting a recollection of events which occurred more than 20 years before cannot justify acceptance of the accuracy of the statement at least in the absence of cross-examination. Such an affidavit does not and cannot furnish the necessary factual support for summary judgment. Extreme caution should be exercised before entering a judgment against a party who was not present, particularly in the absence of any objective evidence of what occurred at those meetings, cf. *Bilotti v. Accurate Forming Corp.*, 39 *N.J.* 184, 193 (1963), or testimony which the opposing party had had the opportunity to test by cross-examination, *cf. Beadling v. Sirotta*, 39 *N.J.* 34 (1962). Nor are we satisfied on the basis of the moving papers that the subsequent plans for repairing the road constituted an "improvement" to the original construction as distinguished from maintenance. We remain mindful of the principle that on a motion for summary judgment, the movant must exclude any reasonable doubt as to the existence of a factual issue. *Ruvolo v. American Casualty Co.*, 39 *N.J.* 490, 499 (1963).[1]

---

[1]The dissent seems to assume that the government is immune from liability under *N.J.S.A.* 59:4–6 even though its negligent maintenance of property causes the existence of a dangerous condition. Any such assumption is misplaced. That provision only applies to plans or designs of original construction or any "improvement" to the original construction.

When the dangerous condition arises because of the design or plan of the original construction, governmental immunity attaches and remains, even though a dangerous condition may subsequently arise because of the activities of others. However, that does not immunize a governmental body from responsibility for dangerous conditions created by its careless or negligent affirmative acts arising out of its maintenance as distinguished from improvements to its property.

*Baldwin v. State*, 6 *Cal.*3d 424, 491 *P.*2d 1121, 99 *Cal.Rptr.* 145 (1972), to which the dissent refers, is irrelevant to the issue in this case. In *Baldwin*, plans for construction of a highway made no provision for a left-hand turning lane at a certain intersection because at the time traffic conditions did not warrant any such special consideration. Twenty-five years later the traffic pattern had changed so that the failure to have a traffic control at the intersection allegedly resulted in a dangerous condition. In the litiga-

The Department also argues that it is entitled to immunity under *N.J.S.A.* 59:2-3. That section reads as follows:

a. A public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity;

b. A public entity is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature;

c. A public entity is not liable for the exercise of discretion in determining whether or [*sic*] to seek or whether to provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adequate governmental services;

d. A public entity is not liable for the exercise of discretion when, in the face of competing demands, it determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public entity was palpably unreasonable. Nothing in this section shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions.

Subdivisions (b), (c) and (d) of *N.J.S.A.* 59:2-3 do not by their terms cover the action taken here. Neither legislative nor judicial action is implicated (subdivision (b)); nor is discretion in determining whether to provide the funds necessary for the construction or maintenance of the road (subdivision (c)); nor does defendant suggest that a choice among competing demands for existing resources is involved (subdivision (d)).

Subdivision (a) of *N.J.S.A.* 59:2-3 states broadly that a public entity is not liable for an injury resulting from the exercise of judgment or discretion. However, subdivision (a)

---

tion involving a claim for injuries arising out of an automobile accident at that intersection, the California Supreme Court held that the immunity under the California statute, *Cal.Gov't Code* § 830.6 (West 1966), whose language served as a model for our Tort Claims Act, did not apply. The Report of the New Jersey Attorney General's Task Force on Sovereign Immunity (1972) rejected that interpretation and concluded that the plan or design immunity should be perpetual, Report at 223, a position adopted by our Legislature. That proposition does not immunize a public entity for a dangerous condition caused by its careless affirmative acts involving maintenance.

should be read in conjunction with the areas of protected discretion expressly outlined in subparagraphs (b), (c) and (d). All the subsections should be read consistently, each with respect to the subject of the others. These subparagraphs are signposts to understanding the nature of immunized discretionary determinations. They suggest that the "exercise of . . . discretion" in *N.J.S.A.* 59:2–3(a) refers to actual, high-level policymaking decisions involving the balancing of competing considerations. Such decisions have been traditionally entrusted to coordinate branches of government, and courts, utilizing standard tort principles, are ill-equipped to interfere with them. These discretionary determinations likely include such decisions as "whether to utilize the Department's resources and expend funds for the maintenance of [a] road; whether to repair the road by patching or resurfacing; [and] what roads should be repaired . . .." *Costa v. Josey*, 79 *N.J.* at 545. Once it is determined that a maintenance program involving resurfacing will be undertaken, however, the government will ordinarily be held to the standard of care set forth in *N.J.S.A.* 59:4–2. Although the exercise of some discretion may still be involved (*e. g.*, the transportation planners may choose one resurfacing plan over another), the immunity rule will protect only basic policy determinations. Such a construction would be in harmony with subparagraphs (b) through (d).

A task force selected by the Attorney General drafted the New Jersey Tort Claims Act. Its Report on Sovereign Immunity, published in May 1972, contained substantial explanatory comment. It is fitting, therefore, that we look to that comment in searching for the legislative intent of *N.J.S.A.* 59:2–3. The Comment explains that this provision was intended to codify existing law. It cites as examples, *Willis v. Dep't of Conservation & Economic Development*, 55 *N.J.* 534 (1970), *Amelchenko v. Freehold Borough*, 42 *N.J.* 541 (1964), and *Bergen v. Koppenal*, 52 *N.J.* 478 (1968). All three cases, along with *Fitzgerald v.*

*Palmer*, 47 *N.J.* 106 (1966), support the principle that only high-level policy determinations are entitled to immunity.

*Fitzgerald* and *Amelchenko* both involved high-level policy choices. In *Fitzgerald* we rejected a claim that the Highway Department, in constructing a highway overpass, should have built a fence to prevent persons from throwing objects on cars passing below. This was because matters such as "whether a road should have four or six or eight lanes," or should have "dividers, or circles or jughandles for turns, or traffic lights, or traffic policemen," or a certain speed limit "involve discretion . . . and are committed to the judgment of the legislative and executive branches." 47 *N.J.* at 109–110.

In *Amelchenko* we found that a municipality had not breached the duty it owed under *N.J.S.A.* 40:60–25.5 to a person who fell in an unplowed municipal parking lot several days after a snowstorm. The Court found that the municipal officials' determinations as to which streets and lots to plow and in what order constituted a high-level policy choice. 42 *N.J.* at 550.

On the other hand, in *Willis* the Court upheld the cause of action of a three-year-old child who claimed that the traumatic amputation of her arm in feeding sugar to a caged bear was the result of the State's negligence in leaving the cage unattended and in permitting holes to remain in the screening. The Court held that, once the State decided to cage a wild animal, ordinary tort principles would govern the question of the adequacy of suitable safeguards.

The Comment to *N.J.S.A.* 59:2–3 also indicates that subparagraph (a) provides the broad immunity for discretionary acts adopted by other jurisdictions including California (*Cal.Gov't Code* § 820.2 (West 1966)) and by the federal government (Federal Tort Claims Act, 28 *U.S.C.A.* § 2680(a)). Both the California and the federal statutes contain broadly worded clauses predicating immunity upon the exercise of discretion. Although neither contains clauses of specific restrictive nature similar to subparagraphs (b) through (d) of the New Jersey Act,

both statutes have been construed to protect only basic policy decisionmaking.

Since the New Jersey statute was patterned in large measure after the California statute, we turn first to the California law. The California act provides:

[A] public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused. [*Cal.Gov't Code* § 820.2 (West 1966)]

The act also states that when the public employee is immune from liability, the public entity is generally immune as well. *Cal.Gov't Code* § 815.2 (West 1966). The seminal opinion dealing with the meaning of the discretionary immunity is *Johnson v. State*, 69 *Cal.2d* 782, 447 *P.2d* 352, 73 *Cal.Rptr.* 240 (Sup.Ct.1968). In that case the plaintiff had sued the state for its failure to warn that a 16-year-old boy who was placed as a foster child with the plaintiff had homicidal tendencies and a background of violence and cruelty to humans. Plaintiff suffered injuries when assaulted by the boy. When she sued the state, summary judgment was entered in favor of the state. The California Supreme Court reversed.

After carefully analyzing the statute and its purposes, Justice Tobriner, writing for the court, enunciated a two-part test. First, only "basic policy decisions" could have an immunizing effect. He distinguished between planning and operational decisionmaking, only the former being entitled to immunity. Second, when a "basic policy decision" was made, it would also be incumbent upon the state before it was entitled to immunity to prove that the policy maker consciously exercised discretion in the sense of assuming certain risks to gain other policy objectives. As Justice Tobriner declared, the state must demonstrate that a "conscious balancing [of] risks and advantages" occurred. *Id.* at 794, 447 *P.2d* at 361 n. 8, 73 *Cal.Rptr.* at 249 n. 8.

The Federal Tort Claims Act exempts from liability a claim "based upon the exercise or performance or the failure to

exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 *U.S.C.* § 2680(a). In *Dalehite v. United States*, 346 *U.S.* 15, 42, 73 *S.Ct.* 956, 971, 97 *L.Ed.* 1427, 1444 (1953), the United States Supreme Court defined immunity in terms of planning as distinguished from operational decisionmaking. This distinction was subsequently reaffirmed in *Indian Towing Co. v. United States*, 350 *U.S.* 61, 76 *S.Ct.* 122, 100 *L.Ed.* 48 (1955). There a tugboat ran aground when a light on a lighthouse failed to function, due to the negligence of a Coast Guard employee. Although the government conceded that only operational decisionmaking was implicated, the Supreme Court nevertheless drew the distinction between the decision to undertake the lighthouse service which involved planning discretion and decisions regarding maintenance which were operational. Once the planning discretion had been exercised and the decision made, the Coast Guard "was obligated to use due care to make certain that the light was kept in good working order . . . ." 350 *U.S.* at 69, 76 *S.Ct.* at 127, 100 *L.Ed.* at 56.

This dichotomy between planning and operation has been applied in subsequent federal decisions. See, *e. g., Driscoll v. United States*, 525 *F.*2d 136 (9 Cir. 1975) (reversing dismissal of the complaint, court held that even if an engineer's decision to provide traffic control services at an Air Force base was made at the planning level, one could conclude that his decision not to install warning devices, barriers and crosswalks was made at the operational level, was susceptible to review using standard tort principles, and hence was not subject to immunity); *Seaboard Coast Line R. Co. v. United States*, 473 *F.*2d 714 (5 Cir. 1973) (although government's decision to build an aircraft maintenance facility and to build a drainage system involved immunized discretion, the building of a drainage ditch was an operational function subject to a suit by plaintiff who alleged that because of the negligent construction of the ditch, railroad

tracks were undermined and a train derailed); *American Exchange Bank v. United States*, 257 *F.*2d 938 (7 Cir. 1958) (although immunized discretion was involved in the decision whether to build and where to locate a post office, the decision as to whether to include a handrailing for the steps in front of the building did not create immunity).

The principles announced in *Johnson* and in the federal cases support the conclusion that the exemption contemplated under *N.J.S.A.* 59:2–3(a) concerns the "exercise of judgment or discretion" in making basic policy—the type made at the planning, rather than the operational level of decisionmaking. Moreover, immunity is contingent upon proof that discretion was actually exercised at that level by an official who, faced with alternative approaches, weighed the competing policy considerations and made a conscious choice.

Thus, determination of whether to undertake a maintenance program might have involved a policy choice as to the allocation of resources as in *Amelchenko*. Once the decision to maintain was made, however, the tort immunity would seem to have ended, as it did in *Willis*. At that point high-level determinations to provide a program and how to allocate existing resources were complete. Although some discretion may have been exercised as different resurfacing programs were considered, this decision would ordinarily be made at an operational level and not rise to the level of discretion exercised, in *Fitzgerald* and *Amelchenko*. We recognize that the resurfacing plans in this case were approved by high-level officials, the State Highway Engineer and the Commissioner of Transportation. Although the identity of the decision-maker may indicate that the decision involves basic policymaking, that conclusion does not follow. A high-level official may make operational decisions as well. Here, the record is devoid of any evidence that the Engineer's and Commissioner's approval was other than an operational determination. It may simply have signified that the plans accorded with the policy decision to expend funds and

resurface that road. Even a conscious approval of the details of the plan would not have removed it from the category of an operational decision. Moreover, subsumed within the principle that the public entity is immune when it exercises its discretion with respect to basic policy, is the necessity for demonstrating that there has in fact been an exercise of that discretion. Here, for example, assuming that a basic policy matter was involved, there is nothing to indicate that any competing policy choices were actually considered when the resurfacing plan was made and approval given.

That the discretionary function immunity should be limited to actual policymaking is further supported by practical considerations. It is apparent that a literal interpretation of the term "discretion" would effectively exempt from the operation of the Tort Claims Act *all* government action unless it resulted from mere inadvertence. Almost all official conduct, no matter how ministerial, involves the exercise of some judgment and decision-making. To construe subsection (a) that broadly, however, would in effect eliminate most of the liability which the Legislature clearly intended to permit when it enacted the statute. Summary judgment on the basis of discretionary immunity under *N.J.S.A.* 59:2–3 was not warranted.

We reverse and remand for a plenary trial at which all the facts may be fully developed with respect to the applicability of the immunity provisions of *N.J.S.A.* 59:2–3 and *N.J.S.A.* 59:4–6.

CLIFFORD, J., dissenting.

Being generally in accord with the views expressed by Judge Horn for the Appellate Division, 160 *N.J.Super.* 1 (1978), I would affirm. Summary judgment was properly entered for the Department of Transportation.

The subject of this dispute is a concrete center divider on Route 4 in Teaneck. The divider was constructed in 1956 pursuant to plans approved by the State Highway Engineer and the State Highway Commissioner. At that time the barrier was

19 inches high. In 1962 and again in 1974 the particular stretch of Route 4 in question was resurfaced. The 1972 resurfacing was completed pursuant to plans approved by the State Highway Engineer and the State Highway Commissioner. Plans for the 1974 resurfacing were designed by Bernard Olszanowski, the coordinator for the State Department of Transportation's resurfacing program, and approved by the Chief of the Bureau of Maintenance and by Mr. James R. Schuyler, Chief Engineer, Construction and Maintenance. As a result of the 1962 and 1974 resurfacings the vertical facing at the base of the divider was eliminated and the height of the divider was reduced to about 14 or 15 inches.

The plaintiff argues that the resurfacing substantially changed the nature of the divider, transforming it into a vaulting ramp. He charges the Department of Transportation with negligently maintaining and repairing the divider, thereby creating a dangerous condition which caused the accident. The Department defends on the basis of immunity afforded by the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 *et seq.* (hereafter the Act), particularly plan and design immunity, *N.J.S.A.* 59:4–6, and discretionary activities immunity, *N.J.S.A.* 59:3–2.

Immunity is the dominant consideration of the Act. See, *e. g.*, *Malloy v. State*, 76 *N.J.* 515, 519 (1978). It is beyond dispute that the legislative intent was to restore the State's tort and contract immunity subject to certain carefully delineated exceptions. *Id.* at 518–19; *N.J.S.A.* 59:1–2. To make this as explicit as possible, the Comment to *N.J.S.A.* 59:2–1 states that the statute is "intended to ensure that any immunity provisions provided in the act or by common law will prevail over the liability provisions." [1]

---

[1] The Comments appended to the statute are taken from the Report of the *Attorney General's Task Force on Sovereign Immunity—May 1972*, and accompanied the Act during its consideration by the legislature. They have the precedential weight and value of legislative history. See *Ellison v. Housing Auth.*, 162 *N.J.Super.* 347, 353 (App.Div.1978) (Comment cited as indicative of legislature's express intention).

In dealing with the liability of public entities for conditions of public property, the legislature set forth a specific scheme. See *N.J.S.A.* 59:4–1 *et seq.* Of especial interest and indeed controlling import is *N.J.S.A.* 59:4–6, which states:

> Neither the public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of public property, *either in its original construction or any improvement thereto*, where such plan or design has been approved in advance of the construction or improvement by the Legislature or the governing body of a public entity or some other body or a public employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved. (Emphasis added.)

The legislative intention behind this section of the Act is clear. As appears from the Comments, this section "is intended to grant a public entity and a public employee complete immunity for injuries resulting from a plan or design of public property when it has been officially approved by an authorized body." Comment, *N.J.S.A.* 59:4–6. The policy behind the immunity is self-evident. Were it otherwise, the State would be exposed to a very broad and extensive sphere of liability against which adequate economic protection would be impossible.

> A private entrepreneur may readily be held for negligent omissions within the chosen ambit of his activity. But the area within which government has the power to act for the public good is almost without limit, and the State has no duty to do everything that might be done. Rather there is a political discretion as to what ought to be done, as to priorities, and as to how much should be raised by taxes or borrowed to that end. If government does act, then, when it acts in a manner short of ordinary prudence, liability could be judged as in the case of a private party. So if a road were constructed of a design imperiling the user, the issue of fault would present no novel problem. But whether a road should have four or six or eight lanes, or there should be dividers, or circles or jughandles for turns, or traffic lights, or traffic policemen, or a speed limit of 50 or 60 miles per hour—such matters involve discretion and revenue and are committed to the judgment of the legislative and executive branches. As to such matters, the

question is whether a judge or jury could review the policy or political decisions involved without in effect taking over the responsibility and power of those other branches. [*Fitzgerald v. Palmer*, 47 *N.J.* 106, 109–10 (1966).]

Examination of *N.J.S.A.* 59:4–6 discloses that there are several grounds for immunity built into one section: (1) the plan, design or improvement has been approved by an official body; (2) the plan, design or improvement has been approved by a public employee exercising discretion; (3) the plan, design or improvement is in conformity with standards previously so approved. For purposes of such immunity the design or plan need only be approved in advance of construction, either by the legislative body of the public entity or by an employee exercising discretionary authority to give approval. *Thomson v. City of Glendale*, 61 *Cal.App.*2d 378, 132 *Cal.Rptr.* 52, 56 (Ct.App. 1976). Further, there is no requirement that the design or plan be expressed in any particular form. *Id.* at 385, 132 *Cal.Rptr.* at 57.

Unlike the situation in *Ellison v. Housing Auth.*, 162 *N.J.Super.* 347 (App.Div.1978), the State here has offered clear and uncontroverted proof that the divider was constructed and the subsequent road resurfacings were performed pursuant to a plan approved by an official body or a public employee exercising discretion, or by both. The substance of the affidavits submitted by the State concerning this prior approval has not been contested by the plaintiffs. Both the trial court and the Appellate Division concluded that this prior approval was sufficient to bring the resurfacing within *N.J.S.A.* 59:4–6. 160 *N.J.Super.* at 10. Thus the inquiry is ended. Where the plan or design of an improvement to public property has been approved by a public employee exercising discretion or by an official body, the State is immune from liability for injuries resulting from a dangerous condition on that public property. *Rodgers v. Passaic Housing Auth.*, 139 *N.J.Super.* 569 (App.Div.), certif. den., 71 *N.J.* 337

(1976); *N.J.S.A.* 59:4–6. See *Cobb v. Waddington*, 154 *N.J.Super.* 11 (App.Div.1977), certif. den., 76 *N.J.* 235 (1978); *Spin Co. v. Maryland Cas. Co.*, 136 *N.J.Super.* 520 (Law Div.1975).

The plaintiffs seek to evade the immunity mandated by the statute by arguing that there is a factual dispute as to the original purpose of the divider's vertical facing—that is, so much of the facing as was covered by the subsequent road resurfacings. As I read the majority opinion, the Court may very well have been distracted by this suggestion. The argument overlooks the point that where the subsequent resurfacing is immunized under *N.J.S.A.* 59:4–6, facts involving the resurfacing and the original design of the divider simply are not material. See, e. g., *Allstate Ins. Co. v. Metropolitan Sewerage Comm'n*, 80 *Wis.*2d 10, 258 *N.W.*2d 148 (1977).

In *Allstate,* the plaintiff was involved in an automobile accident while trying to avoid a truck discharging effluent into a manhole in the traveled portion of the street. The manhole was part of the sewage system maintained and operated by the City of Milwaukee and the municipal sewerage commission had issued the truck a permit for the dumping. 258 *N.W.*2d at 149. The Wisconsin Supreme Court concluded that the decisions of the city commission in planning and designing the sewage system, including the placement of the manhole, were legislative acts performed pursuant to the commission's authority to plan and construct sewer systems in the metropolitan Milwaukee area. *Id.* at 150. As such, the municipal corporations involved were immune from liability.

> If the placement of the manhole was in compliance with the location set forth in the plan it was a nondiscretionary act . . . and protected by governmental immunity. This is so even though the placement and subsequent use of the manhole may have created a danger. [*Id.* at 151 (footnote omitted).]

The Wisconsin court expressed no opinion on the question of whether the municipal immunity that attached to the planning

function should persist in view of subsequent experience or changed conditions which demonstrate an actual and substantial danger. *Id.* n. 5.

That question was addressed in *Baldwin v. State,* 6 *Cal.*3d 424, 491 *P.*2d 1121, 99 *Cal.Rptr.* 145 (1972). There the California Supreme Court held that where changed physical conditions produce a dangerous condition of public property causing injury, the public entity does not retain statutory immunity from liability even though the plan or design of the construction or improvement to the public property is shown to have been reasonably approved in advance or prepared in conformity with standards previously so approved. *Id.* at 438, 491 *P.*2d at 1127–28, 99 *Cal.Rptr.* at 154–55. In *Baldwin,* the changed physical condition was a substantial increase in road traffic. *Id.* at 429, 491 *P.*2d at 1123–24, 99 *Cal.Rptr.* at 147.

Notwithstanding its assertion to the contrary it appears from its emphasis on maintenance and allocation of resources, *ante* at 342, that the majority is attempting to inject the rule in *Baldwin* into our tort claims jurisprudence. On the face of it this is a logical effort, since our Tort Claims Act is modeled after the comparable California statute. Normally, we may profitably look for guidance to the interpretative decisions on the subject in the California courts. *Burg v. State,* 147 *N.J.Super.* 316, 322 (App.Div.), certif. den., 75 *N.J.* 11 (1977). However, in pursuing that course in the circumstances before us, the majority today does indirectly that which it has been instructed not to do directly; for the legislature flatly disapproved of the *Baldwin* case in the Comments accompanying the Act. Comment, *N.J. S.A.* 59:4–6. *Baldwin* was "specifically rejected as unrealistic and inconsistent with the thesis of discretionary immunity—that a coordinate branch of government should not be second-guessed by the judiciary for high level policy decisions." *Id.* While there is much to be said *as a matter of policy* for the *Baldwin* rule—and, by the same token, for the rule adopted by the

majority today—that rule is simply and plainly not the law of New Jersey. It is not within the province of this Court to override the legislature's unmistakable rejection of the *Baldwin* rule.

The Act clearly dictates that there is no limitation on the length of protection offered to governmental entities by the statutory immunity of *N.J.S.A.* 59:4–6. As the Comment states:

[I]t is intended that the plan or design immunity provided in this section be perpetual. That is, once the immunity attaches no subsequent event or change of conditions shall render a public entity liable on the theory that the existing plan or design of public property constitutes a dangerous condition.

Accordingly, I would affirm.

Justices HANDLER and POLLOCK join in this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices JACOBS, PASHMAN and SCHREIBER—4.

*For affirmance*—Justices CLIFFORD, HANDLER and POLLOCK—3.