**BEREL COMPANY, Plaintiff,**

v.

**SENCIT F/G McKINLEY ASSOCIATES, Defendant, Third Party Plaintiff,**

v.

**SULLIVAN ARFAA, P.C., Third Party Defendant, Fourth Party Plaintiff,**

v.

**PENNONI ASSOCIATES, Donald Nardy, John Gamble and the New Jersey Housing and Mortgage Finance Agency, Fourth Party Defendants.**

Civ. A. No. 86–3285.

United States District Court,
D. New Jersey.

March 3, 1989.

Mesirov, Gelman, Jaffe, Cramer & Jamieson by Anthony Creato, Jeffrey A. Mintz, Cherry Hill, N.J., for plaintiff, Berel Co.

Konray & Kerekes by Roy J. Konray, Clark, N.J., for defendant-third party plaintiff, Sencit F/G McKinley Associates.

James S. Kilpatrick, Jr., Ocean City, N.J., for third party defendant-fourth party plaintiff, Sullivan Arfaa, P.C.

W. Cary Edwards, Atty. Gen. of New Jersey by Joseph B. Reilly, Deputy Atty. Gen., Trenton, N.J., for fourth party defendant, New Jersey Housing & Mortg. Finance Agency.

Finnegan & Barth by John J. Finnegan, III, Cherry Hill, N.J. and Byron R. Lavan, Lafayette Hill, for fourth party defendant, Donald Nardy.

Brennan and Bernardin, P.C. by Michael J. Brennan, Collingswood, N.J., for fourth party defendant, John Gamble.

## OPINION

COHEN, Senior District Judge:

Fourth party defendant, The New Jersey Housing and Mortgage Finance Agency ("Agency") has filed a motion to dismiss all claims against it asserted by plaintiff, Berel Company ("Berel") and fourth party plaintiff, Sullivan Arfaa P.C. ("Sullivan"). Plaintiff, Berel, moves for partial summary judgment against defendant, Sencit F/G McKinley Associates ("Sencit"). Both motions were argued before the Court orally on the same day, and will be disposed of consecutively below.

### I. FACTUAL HISTORY

This controversy emanates from the construction of a residential housing apartment complex known as the McKinley Apartments in Atlantic City, New Jersey ("the complex"). The complex, which is also known as the Garden Court Apartments, consists of approximately twenty buildings comprising 177 units, twenty-seven of which were designated for low and moderate income rental, and is substantially complete. It is a low rise complex, that is, no building is more than three stories high.

Defendant Sencit is a limited dividend partnership which owns the complex. On May 1, 1984, Sencit entered into a written agreement with Berel whereby Berel agreed to serve as general contractor and construct the complex ("Berel–Sencit Agreement"). In the Berel–Sencit Agreement, both Berel and Sencit agreed to be bound by Agency law. *See* Berel–Sencit Agreement, Article 3, at 8. Sencit then executed five contemporaneous agreements with the fourth party defendant, Agency, on June 7, 1984, borrowing $9,877,000 to assist in the development of the complex: 1) "Mortgage Agreement"; 2) "Mortgage Note"; 3) "Deed Restriction and Regula-

tory Agreement" ("Deed Agreement"); 4) "Loan Agreement"; and 5) "Fee Mortgage".[1] Of the $9,877,000 loaned, $7,130,000 was allocated for costs of construction of the complex. Sencit also contracted with defendant Sullivan, an architectural design firm, to provide the design for the complex and provide inspection during construction. ("Sullivan–Sencit Agreement"). Sullivan in turn contracted with fourth party defendants Donald Nardy ("Nardy"), John Gamble ("Gamble") and Pennoni Associates ("Pennoni")[2] to provide engineering consulting services.

After doing certain extra work and changing certain work already completed upon inspection, Berel substantially completed construction of the complex. Berel submitted change order proposals for the excess and redone work, which were required to be approved by Sencit, Sullivan and the Agency, as a condition precedent to payment under the Berel–Sencit Agreement. Certain change orders were approved by all parties at a meeting held on May 21, 1986; however, various other change orders, including Numbers 30, 35 and 36 were not approved by Sencit and Sullivan at that time and remain at issue. Berel alleges that in many instances, change orders which received the requisite approval have still not been paid.

Separate and apart from the submitted change order proposals and approved change orders controversy, the Agency alleges that certain work was done incorrectly and needs to be cured before it will authorize any further payments on the project. The Agency has designated these items on a separate "punch list," which the Agency estimates will cost approximately $118,388 to complete.

## II. PROCEDURAL HISTORY

On August 20, 1986, Berel filed suit in this Court against defendant Sencit for breach of contract, alleging damages in excess of $2,000,000. In response thereto, on September 26, 1986, Sencit brought a third party action against Sullivan for breach of contract, negligent performance, and indemnification. In turn, Sullivan brought a fourth party action against some of the engineering consultants it had retained, (Nardy, Gamble and Pennoni) for indemnification. Sullivan also joined the Agency as a fourth party defendant in its request for indemnification. Approximately one year later, Berel filed claims directly against the Agency in tort and breach of contract. So that what we have here is each party playing the role—so to speak—of both a plaintiff and a defendant, except the Agency which is just a defendant.

On August 6, 1987 we denied the Agency's motion to dismiss for lack of jurisdiction predicated upon the Eleventh Amendment. On December 18, 1987 we denied Sencit's and the Agency's motions to add the surety on the performance bond, United States Fidelity and Guaranty Company, as a fifth party defendant. Neither decision was appealed.

Finally, Judge Simandle, United States Magistrate, recently granted Berel's motion to amend its complaint to include a counterclaim against Sullivan directly, in an Opinion and Order filed January 25, 1989. We affirmed that ruling in our own Opinion and Order dated February 24, 1989. 125 F.R.D. 100.

## III. THE AGENCY'S MOTION TO DISMISS

### A. *Berel vs. The Agency*

Berel's direct claims against the Agency were apparently asserted in both tort for negligence and contract for breach of implied agreement. We will first resolve whether an agreement exists upon which

---

**1.** In addition to Sencit and the Agency, the latter two agreements also involve other parties who are not participants to this lawsuit. The Loan Agreement was signed by the Atlantic County Improvement Authority, First National State Banks of New Jersey, as well as Sencit and the Agency. The other signatory to the Fee Mortgage beside Sencit and the Agency is the Atlantic City Transportation Corporation.

**2.** On December 20, 1988, we granted summary judgment to fourth party defendant, Pennoni Associates, against all parties, and denied Gamble's and Nardy's motions for summary judgment as against Sullivan and the Agency.

the Agency could be liable to Berel in contract and then determine the applicability of the New Jersey Tort Claims Act, N.J.S. A. 59:1-1, *et seq.* ("Tort Claims Act").

### 1. Alleged Breach of Contract

In its supporting brief, the Agency suggested that Berel's direct claims against it in Berel's Complaint filed August 31, 1987, were grounded solely in tort.[3] Berel's opposition memorandum argued that its claims were grounded not only in tort, but also "arise, in part, out of two separate contracts." *Id.* at 5. Berel then asserted two different theories for breach of contract;[4] first, the existence of an agreement between Berel and the Agency, not memorialized in and of itself, but allegedly indicated by a reference in the Berel–Sencit Agreement, Article 48; and second, a third-party beneficiary theory.[5]

#### a. Berel's "Direct" Agreement Allegation

█ Berel claims that an agreement between it and the Agency exists, which, if it were in writing which it is not, would simply read: "The Agency will not withhold approval of Berel's change order proposals (and other things) unreasonably." *See* Affidavit of David Altman. As evidence of this alleged "agreement", Berel points to a provision in the Berel–Sencit Agreement[6] at Article 48, which states:

### ARTICLE 48. AGENCY AS QUASI ARBITRATOR

Wherever, pursuant to the Contract Documents, the Agency declares its judgment, discretion or opinion be determinative of any matter, and such determination is not accepted by any party, the reasonableness of the decision of the Agency shall be determined by law. Whenever the documents provide for the approval of the Agency, it shall not be unreasonably withheld.

To overcome the Statute of Frauds defense raised by the Agency to Berel's as-

---

3. The operative paragraph in Berel's Complaint asserting liability on the part of the Agency is ¶ 3 which states in full:

> 3. To the extent any damages suffered by plaintiff, as set forth in plaintiff's claims against defendant Sencit, were caused by any action or inaction on the part of fourth-party defendant, [Agency], plaintiff Berel Company demands judgment against [the Agency].

4. We have previously concluded that Berel may base its cause of action in contract, *see* slip op. 86–3285 (D.N.J. August 6, 1987), as the State of New Jersey has waived its sovereign immunity from liability arising out of express and implied in fact contracts. *See* N.J.S.A. 59:13–3 and no Eleventh Amendment bar exists.

5. At this point we note that some of our brethren have relied on a party's failure to specifically plead the existence of a non-incidental third-party beneficiary relationship to grant a motion to dismiss. *See Picture Lake Campground v. Holiday Inns, Inc.,* 497 F.Supp. 858, 862 (E.D.Va. 1980) ("The Court is constrained to point out, however, that Count One is devoid of any allegations as to [plaintiff's] right to recover from [defendant] as a third party beneficiary of the License Agreement. Indeed, plaintiffs make this allegation for the first time in their Brief In Opposition to [defendant's] Motion to Dismiss. Until plaintiffs' complaint is formally amended to reflect the third party beneficiary claim, [plaintiff] has not stated a claim for which relief can be granted. Fed.R.Civ.P. 12(b)(6)."). *See*

*also Hauer v. Bankers Trust New York Corporation,* 425 F.Supp. 796, 800 (E.D.Wisc.1977) ("Count X, to which this motion of the defendants [to dismiss] is also addressed, asserts that [plaintiffs] were injured as a result of the nonperformance of a contract between [a third party] and the defendant [ ], which nonperformance was induced by the defendants. There are no allegations supporting any rights of these parties plaintiff to have the contract between other parties performed, such as allegations of assignment rights or rights as third party beneficiaries....")

However, we take the more liberal position following Judge Lacey in *Angleton v. Pierce,* 574 F.Supp. 719, 735 (D.N.J.1983) *aff'd* 734 F.2d 3 (3rd Cir.), *cert. denied,* 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183, *reh'g denied,* 469 U.S. 1067, 105 S.Ct. 551, 83 L.Ed.2d 438 (1984). We therefore imply from Berel's Complaint that their cause of action is partially asserted on third party beneficiary grounds to which we (and the Agency) were adequately enlightened in the numerous and abundant submitted memoranda on this point. We make this assumption because we are on the eve of trial and see no reason to delay the trial merely to let Berel amend its complaint to properly assert its claim.

6. Although Berel emphasizes that this contract was prepared by the Agency for use by Sencit, which it clearly was, we do not think that mere preparation of the Agreement will suffice to establish liability.

sertion of an Agreement, merely evidenced by this provision, Berel reminds us that summary judgment is improper where there is a genuine issue of material fact, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[7] We agree with Berel's statement of the proposition of law, but do not concur in their belief that the facts herein present a genuine issue of material fact.

We do not agree with Berel that the Berel–Agency agreement exists in writing. Article 48 makes the Agency a quasi-arbitrator, not a party to the agreement between Berel and Sencit. Further, in characterizing the Agency as quasi-arbitrator the intent of Berel could not as a matter of law have been to make it contractually bound to that language, because arbitrators are afforded generous immunity from liability for the consequences of their decisions. *Cahn v. International Ladies' Garment Union*, 311 F.2d 113, 114 (3d Cir.1962). *See also Arroyo v. Crown Air/Dorado Wings*, 672 F.Supp. 50, 53 (D.Puerto Rico 1987).

Thus, in its role as arbitrator, the Agency would be afforded immunity comparable to that bestowed upon judges who also make decisions of great importance with potentially considerable detrimental financial impact. We believe that this provision most likely provides a standard for review of an Agency decision, reasonableness, but is clearly not embodiment of or evidence of a separate contractual agreement between Berel and the Agency.

In any event, the explicit terms of Article 3 of the Berel–Sencit Agreement clearly exclude the Agency from being designated a party to that Agreement:

> Any inspection, approval, review of the work, direction or supervision by the Agency or its representatives exercised pursuant to the Contract is performed in accordance with its responsibility as Lender and as an instrumentality of the State of New Jersey pursuant to the Agency law and shall not make the Agency a party to this Contract and in no way is intended to relieve the Owner of its obligations pursuant to the Contract Documents or its Mortgage Loan with the Agency.

Berel–Sencit Agreement, Article 3, at 8. That the Agency was not to be considered a party to the Berel–Sencit Agreement is reinforced by substantively identical clauses contained in the Mortgage Agreement and Fee Mortgage:

> Construction of the Project [the complex] shall at all times be subject to the inspection, review, regulation and approval of the Lender [the Agency] and its duly authorized representatives, but any such inspection, regulation and review or approval of the Lender shall be solely for its benefit and the benefit of the bondholders and in furtherance of its obligations under the Act *and shall not be construed as making the Agency a party to the Construction Contract.*

Mortgage Agreement § 6 at 4; Fee Mortgage § 6 at 4–5 (emphasis supplied). When a provision in a contract is clearly unambiguous on its face, we have to assume that the parties meant to achieve the result the provision provides. *See, e.g., Levison v. Weintraub*, 215 N.J.Super. 273, 276, 521 A.2d 909 (App.Div.1987) ("Where the terms of a contract are clear and unambiguous there is no room for interpretation or construction and we must enforce those terms as written.") Thus, Article 48 cannot serve as the agreement between Berel and the Agency.

---

**7.** On the question of Statute of Frauds, raised by the Agency in a supplemental letter brief to the Court on October 7, 1988 in response to Berel's supplemental brief, we think that Berel is estopped from arguing, as it does in its Memorandum In Response to the Agency's October 7, 1988 Letter Brief, dated October 17, 1988, that the Statute of Frauds was not pled by the Agency. Berel is barred from this argument, because the Agency could not have been expected to plead the Statute of Frauds as a defense in answer to Berel's amorphous complaint. Clearly ¶ 3 of the Complaint, *supra* note 2, does not on its face suggest it is grounded in breach of contract. Even a careful reading of the entire Complaint would not lead counsel to such a conclusion. We are satisfied that the Agency properly raised this problem after receiving more specific notice of what Berel was truly pleading in Berel's Opposition Memorandum.

■ New Jersey's codification of the Statute of Frauds, N.J.S.A. 25:1–5, specifically requires that:

No action shall be brought upon any of the following agreements or promises, unless the agreement or promise, upon which such action shall be brought or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person thereunto by him lawfully authorized:

b. A special promise to answer for the debt, default or miscarriage of another person;

d. A contract or sale of real estate, or any interest in or concerning the same; or

e. An agreement that is not to be performed within one year from the making thereof.

The alleged agreement between Berel and the Agency is required to be in writing under N.J.S.A. 25:1–5 because it calls for the Agency to answer for the debt, default or miscarriage of another person (i.e., the project manager), and is arguably an interest in, or concerns a contract, or sale of real estate. Even if the previous two provisions are inapplicable the agreement is clearly not one capable of being performed within one year of the making thereof. The construction of the project was to be completed in twelve months, but not to commence until a day specified in a "Notice to Proceed" issued by the Agency some seven to thirty days following the effective date of the Berel–Sencit Agreement according to Article 4 of that Agreement. If the Berel–Sencit Agreement is evidence of a previously existing agreement between Berel and the Agency, as a matter of law, the agreement Berel is asserting was required by N.J.S.A. 25:1–5(e) to have been in writing, because it could not have been completed within one year.

Berel has not been able to produce such a separate writing, and before the Court is an Affidavit from Shirley Allen, the Director of the Agency's Policy Development, in which Ms. Allen avers that:

3. A review of Agency records reveals that the Agency Board never acted to authorize the Agency to enter into any agreement or contract with the Berel Company.

\* \* \* \* \* \*

5. A review of Agency records reveals that the Agency Board never acted to delegate its authority to any employee of the Agency to enter into any agreement or contract with the Berel's Company.

Ms. Allen's Affidavit and Berel's inability to rebut the same by producing a signed writing of any sort leads us to the conclusion that no agreement between the Agency and Berel ever existed. Since there is no agreement, there can also be no genuine issue of material fact on this contract theory. We therefore reject Berel's contention that its complaint states a cause of action for breach of a contract between Berel and the Agency, and grant the Agency summary judgment.

■ Finally, even assuming, *arguendo,* that the Statute of Frauds was inapplicable and that Provision 48 was valid evidence of an unwritten agreement between Berel and the Agency, Berel's complaint would still be unsupportable on this direct contract theory. We come to this conclusion based on the reasoning that a party cannot create a valid contract to provide a pre-existing legal duty, because there is no valid consideration. *See* Restatement (Second) of Contracts § 73 and Comments (1981). Under N.J.S.A. 59:2–3(d), the Agency is already under a duty to not withhold its approval in a "palpably unreasonable" manner, as we shall discuss *infra.* This legal duty *precedes* any such similar assent manifested in a Berel–Agency Agreement, and obviates any last vestiges of plaintiff's argument that a valid enforceable contract existed between Berel and the Agency, leading us to deduce that summary judgment in defendant's favor should be granted.

### b. *Berel's Third Party Beneficiary Theory*

■ Berel obliquely raised the third party beneficiary theory in its Memorandum in Opposition dated August 24, 1988 (late in

**537**

the flurry of papers) in a vague, undeveloped statement with no legal support. The extent of Berel's argument was one paragraph stating:

> Further, Berel is a third party beneficiary to the Contract between Sencit and [the Agency]. By that contract, [the Agency] loaned Sencit almost 10 million dollars, 70 percent of which was payable to Berel. [The Agency], however, has retained monies from the construction loan. Thus, to the extent Berel is entitled to those monies on a contract theory, [the Agency] cannot claim immunity under the Tort Claims Act.

Memorandum in Opposition dated August 24, 1988 at 6. Apparently Berel's argument was designed to overcome the Agency's assertion that Berel's claims were based solely on tort, from which the Agency is immune. This is clear because Berel makes this assertion and then abandons it, spending the balance of its Memorandum arguing the inapplicability nature of the Tort Claims Act. It is not until the Agency's Memorandum in Response, dated August 31, 1988 that the third party beneficiary theory commands the full attention of the parties. Only after the Agency fully briefed the issue did Berel find it necessary to try to flesh out this argument, but in so doing, Berel only discussed the very same case previously cited by the Agency,[8] claiming that that case supported Berel's contention of liability, not the Agency's contention of non-liability. *See* Response of Berel Company to the Agency's Reply Memorandum.

Because this is a motion for summary judgment,[9] a singularly harsh remedy, we fully examine the applicability of this theory to the facts before us in this case.

As jurisdiction is predicated on 28 U.S.C. § 1332, we apply the substantive law of the State in which we sit. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82

L.Ed. 1188 (1938). New Jersey law recognizes three distinct types of third party beneficiaries: "donee beneficiaries," "creditor beneficiaries" and "incidental beneficiaries." *Broadway Maintenance Corp. v. Rutgers*, 180 N.J.Super. 350, 356, 434 A.2d 1125 (App.Div.1981), *aff'd* 90 N.J. 253, 447 A.2d 906 (1982). The first two types are generally considered as having the power of enforcement of the agreement and a cause of action for breach thereof, whereas an incidental beneficiary merely benefits from performance with no attendant right of enforcement. *Id.* Under New Jersey law, the intention of the parties to recognize a right to performance in the third party is the critical factor that governs the characterization of a beneficiary as donee or creditor, rather than incidental. *See Broadway Maintenance Corp. v. Rutgers*, 90 N.J. 253, 259, 447 A.2d 906 (1982); *Rieder Communities, Inc. v. North Brunswick Township*, 227 N.J.Super. 214, 222, 546 A.2d 563 (App.Div.1988); *MGM Construction Corp. v. N.J. Educational Facilities Authority*, 220 N.J.Super. 483, 487, 532 A.2d 764 (Law Div.1987); *Insulation Contracting & Supply v. Kravco, Inc.*, 209 N.J.Super. 367, 375, 507 A.2d 754 (App.Div. 1986). *See also Dravo Corp. v. Robert B. Kerris, Inc.*, 655 F.2d 503, 510 (3d Cir. 1981). We therefore embark on a detailed analysis of the intent of the parties, primarily as evidenced in the Deed Agreement and the circumstances surrounding the manner in which the contractual arrangements were made in this case.

To ascertain the intent of the parties when a contract is silent, we are directed by the New Jersey Supreme Court, "to examine the pertinent provisions in the agreement and the surrounding circumstances...." *Broadway Maintenance*, 90 N.J. at 260, 447 A.2d 906.

**8.** The case cited by both parties is *Broadway Maintenance Corp. v. Rutgers University*, 180 N.J.Super. 350, 434 A.2d 1125 (App.Div.1981), *aff'd* 90 N.J. 253, 447 A.2d 906 (1982).

**9.** Although the Agency's motion requested dismissal for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P.

12(b)(6), this is a proper instance to convert that request to one for summary judgment pursuant to Fed.R.Civ.P. 56 via the mechanism provided in Fed.R.Civ.P. 12(b). *See Carter v. Stanton*, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1971).

**538**

Our thorough examination of the Mortgage Agreement, Mortgage Note, Deed Restriction and Regulatory Agreement, Loan Agreement and Fee Mortgage reveals no provision to support a finding that Sencit and the Agency intended Berel to have a right to performance of that Agreement. For example, Section 2 of the Mortgage Agreement states:

> At or prior to the execution of this Mortgage, the Borrower has entered into a contract for the construction of the Project in accordance with the plans and specifications ("the Construction Contract") and which provides for payment and performance bonds in favor of the Lender and the Borrower.

This provision in essence makes the Agency a third party beneficiary of the Berel–Sencit Agreement, as well as the performance bond between Berel and the surety, United States Fidelity and Guaranty Company ("USF & G")[10] by giving the *Agency* a right to performance in the Berel–Sencit Agreement and not giving *Berel* any rights to performance in the Mortgage Agreement.

Furthermore, several provisions, which could potentially create a right to performance in favor of Berel against the Agency, are set out in nearly identical terms in both the Mortgage Agreement and the Deed Agreement.[11] Berel's argument that it has a right of enforcement as between Sencit and the Agency must be based in one of these provisions, since these are the only substantive right granting provisions contained in any of the various agreements between Sencit and the Agency that could possibly support its claim.[12]

---

**10.** We previously denied Sencit's and the Agency's motions to add USF & G as a fifth party defendant. *See* slip op. 86–3285 (D.N.J. Dec. 18, 1987).

**11.** The relevant provisions are Section 6 in the Mortgage Agreement, which corresponds to Section 9 in the Deed Agreement ("Construction of the Project") and Section 33 in the Mortgage Agreement which corresponds to Section 35 in the Deed Agreement ("Remedies"). These provisions are set forth below, as they are found in the Deed Agreement. Section 6 and Section 9 are substantively nearly identical, the only difference being the terms used to identify the parties.

*Section 9. Construction of the Project.*
[ ] The Owner shall not approve any change in the plans and specifications for the Project or approve any change order under the Construction Contract except with the express written approval or counter-signature of the Agency. Construction of the Project shall at all times be subject to the inspection, review, regulation and approval of the Agency and its duly authorized representatives, but any such inspection, regulation, review or approval of the Agency shall be solely for its benefit and the benefit of the bondholders and in furtherance of its obligations under the Act and shall not be construed as making the Agency a party to the Construction Contract, nor shall it relieve the Owner of any of its obligations under this Agreement, the Mortgage Note or the Construction Contract.
*Section 35. Remedies.*
Upon the occurrence of any Event of Default, the Agency may at its option take any one or more of the following actions or remedies and no failure to exercise any remedy or take any action enumerated shall constitute a waiver of such right or preclude a subsequent exercise by the Agency of any such remedy:

\* \* \* \* \* \*

(j) make effective an assignment of the Construction Contract by the Owner (Borrower) of the Agency, in which event the Agency is specifically empowered by the Owner to exercise any and all rights of the Owner under the construction contract, and at the option of the Agency to proceed with the construction of the Project, in which event all payments by the Owner made with respect to the Construction Contract shall be treated as advances on the Mortgage Loan;
(k) sue the Owner for a mandatory injunction or other equitable relief requiring performance by the Owner of any of its obligations under the Mortgage Loan and this Agreement. The Owner agrees with the Agency that the Agency's remedy at law for the violation or nonperformance of the Owner's obligations under the Mortgage Loan and this Agreement are not adequate by reason, among other things, of the Agency's public purpose to provide adequate, safe and sanitary dwelling units for families of moderate income;
(*l*) sue under the Construction Contract to recover any amount payable to the Owner pursuant of the Construction Contract and to settle any such claim or liability and release the same and apply the proceeds of any such suit, settlement or release to the liabilities of the Owner under this Agreement or the Mortgage Loan, [.]

**12.** Section 1 of the Deed Agreement makes it clear that the parties (Sencit and the Agency) were aware of the agreement between Berel and Sencit and clearly *could have* included provisions which would inure to Berel's benefit

Having closely read these provisions in the light most favorable to Berel and having drawn all reasonable inferences to its advantage, we reach the inescapable conclusion that Berel was not intended to have a right to performance thereunder. Neither Section 9 nor Section 35 of the Deed Agreement (or their counterparts Section 6 and 33 of the Mortgage Agreement) provide any express or implied right to performance over to Berel against the Agency as required in *Broadway Maintenance, supra* at 259, 447 A.2d 906, for Berel to be considered an intended beneficiary. In fact, neither provision provides a right to performance by Sencit as against the Agency. Rather, those provisions give substantive rights to performance *to the Agency* as against Sencit which are not expressly or impliedly reciprocal.

Further, these provisions are not designed to induce the reliance of Berel on the Agency's proper approval as a means of attracting Berel into lowering its price, as was the case in *Broadway Maintenance*, 90 N.J. at 260–62, 447 A.2d 906, since the documents were all entered into contemporaneously, and therefore Berel could not have relied on any of the Sencit–Agency agreements while negotiating the Berel–Sencit Agreement. Also, there is no "damage for delay" clause here as there was in *Broadway Maintenance. See id.*

We find these provisions more akin to those found in the inter-municipal agreement between North Brunswick and South Brunswick in *Rieder Communities v. North Brunswick Township*, 227 N.J.Super. 214, 221–23, 546 A.2d 563 (App.Div. 1988). In *Rieder*, a group of land developers and builders sued to enforce an agreement between the townships of North Brunswick and South Brunswick for the

supply of sewer treatment services. The developers and builders argued that they were intended beneficiaries of the agreement because they were paying (via taxes) for the right to take advantage of the sewer system. Much like Berel's argument that because they were to receive over 70% of the nearly 10 million dollars the Agency loaned to Sencit, they are *ipso facto*, an *intended* beneficiary; the developers and builders in *Rieder* argued that because they developed land in South Brunswick, they were intended beneficiaries of the agreement. The Appellate Division rejected that argument, because they were unable to discern anything in the agreement or in the surrounding circumstances which indicated that the developers and builders were intended to have a right to enforcement in the obligations of the North–South Brunswick contract or to sue for damages allegedly arising from breach of that Agreement. *Rieder*, 227 N.J.Super. at 222–23, 546 A.2d 563. Like the *Rieder* court, we reject Berel's reliance on this argument, and find them to be mere incidental beneficiaries of the Sencit–Agency agreements.

Finally, after giving careful attention to each of the other agreements entered into between the Agency and Sencit on June 7, 1984, we have been able to find nothing to support Berel's third party beneficiary theory. We therefore feel that summary judgment is proper on all counts brought by Berel against the Agency sounding in contract.

**2. The New Jersey Tort Claims Act**

 Berel claims that it is entitled to judgment against the Agency:

> [T]o the extent any damages suffered by plaintiff, as set forth in plaintiff's claims against defendant Sencit, were caused by

---

which would then have made Berel an intended, not incidental beneficiary. Yet, Section 1 as it was actually drafted is not a substantive right-conferring clause. Thus the only right-conferring clauses that could benefit Berel are Sections 9 and 35 of the Deed Agreement and Sections 6 and 33 of the Mortgage Agreement. Section 1 states:

*Section 1. Definitions and Interpretation.* "Construction Contract" means the contract dated as of May 1, 1984 between the Owner

and the Berel Company for the construction of the project.

In actuality, the final version of the Construction Contract, which we refer to as the Berel–Sencit Agreement, was entered into on June 7, 1984 contemporaneously with all of the other agreements, however, it was clearly contemplated while those other agreements were being drafted.

any action or inaction on the part of [the Agency].

Plaintiff's Claim Against Fourth–Party Defendant, New Jersey Housing & Mortgage Financing [sic] Agency at ¶ 3, filed August 31, 1987. It is clear that Berel's claim concerns the "action or inaction" of the Agency's review, inspection and approval, functions which are provided for by state law. Again, because jurisdiction is predicated on 28 U.S.C. § 1332, we look to State law for resolution of the negligence aspect of plaintiff's claim. *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The Agency, established by the New Jersey Legislature in 1983,[13] emerged as the product of a consolidation of two previously existing agencies, the New Jersey Housing Finance Agency ("HFA") (established to assist in financing multi-family housing projects) and the New Jersey Mortgage Finance Agency ("MFA") (established to assist in financing the purchase of single family housing). Armed with a significant augmentation of statutory powers,[14] the potential for autonomously increasing its own treasury[15] and the intrinsic advantages brought by economies of scale,[16] this Agency endeavors to accomplish the ambitious objective of encouraging the development, operation, maintenance, construction, improvement and rehabilitation of "safe and adequate" housing by lending finance capital for the construction, improvement or rehabilitation of housing projects in New Jersey. N.J.S.A. 55:14K–6(a). Created as a direct response to the Legislature's perception that "[c]hanging economic conditions and financial markets have reduced the availability in the private sector of feasible construction and permanent financing" for the construction, rehabilitation and facilitation of housing stock, the lawmakers believed that the proverbial Invisible Hand that guides the laissez-faire marketplace would only lead to further adversity for the local economy and "reduce the number of opportunities for adequate and affordable housing ... available to New Jersey residents." N.J.S.A. 55:14K–2(a), (b).

However, the mere proliferation of large numbers of housing transactions fueled by Agency money alone is not enough to satisfy the Legislature's vision of its promise because the qualitative proviso that housing be "safe and adequate" is an important limitation, and one which has some teeth. As part of the comprehensive statutory framework for financing projects, the law-givers imposed myriad mandatory terms and conditions on all loans made by the Agency, including the following:

b. As a condition of any loan to finance a housing project, the agency shall have the power at all times during the construction, improvement or rehabilitation of a housing project and the operation thereof:

(1) To enter upon and inspect without prior notice any project, including all parts thereof, for the purpose of investi-

---

13. The comprehensive statutory framework which created and controls the Agency is known as the "New Jersey Housing and Mortgage Finance Agency Law of 1983." N.J.S.A. 55:14K–1. *See* N.J.S.A. 55:14K–1 through § 55:14K–44 ("Housing Law of 1983").

14. According to a Committee Statement prepared by the Federal and Interstate Relations and Veterans Affairs Committee of the New Jersey State Senate, it was the express intent of the Legislature to combine the traditional functions of the HFA and MFA, but in addition, provide the newly consolidated Agency with "a *broader* grant of authority for financing housing programs." *See* Senate State Government, Federal and Interstate Relations and Veterans Affairs Committee Statement, Assembly, No. 3463–L.1983, c. 530, *reprinted in* N.J.S.A. 55:14K–1 ("Committee Statement") (emphasis supplied).

15. The newly consolidated Agency has the authority to borrow money by issuing both taxable and nontaxable bonds. *See* Committee Statement, *supra* note 2.

16. The New Jersey Legislature has made this specific finding by declaring that "[t]he combination and enhancement of the powers of the two agencies with respect to the full range of housing types would achieve an economy of scale and better equip the State to deal with the changing housing needs of an increasingly diverse population and economy". N.J.S.A. 55:14K–2(e). This provision of the statute goes on to state that a unified entity can "combine available talent, resources and experience" to attain its goals, which are enumerated therein. *Id.*

gating the physical and financial condition thereof, and its construction, improvement, rehabilitation, operation, management and maintenance, and to examine all books and records with respect to capitalization, income and other matters relating thereto and to make such charges as may be required to cover the cost of such inspections and examinations;

(2) To order such alterations, changes or repairs as may be necessary to protect the security of its investment in a housing project or the health, safety, and welfare of the occupants thereof;

(3) To order any managing agent, project manager or owner of a housing project to do such acts as may be necessary to comply with the provisions of all applicable laws or ordinances or any rule or regulation of the agency or the terms of any agreement concerning the project or to refrain from doing any acts in violation thereof and in this regard the agency shall be a proper party to file a complaint and prosecute thereon for any violations of laws or ordinances as set forth herein;

N.J.S.A. 55:14K–7(b)(1), (2), (3).

It is clear that such terms and conditions exist not only to protect the Agency's collateral, but to serve the public interest as well, for "inadequate" housing cannot be said to inure to the benefit of New Jersey residents—the intended beneficiaries of the Housing Law of 1983 and the actions of the Agency. However, in carrying out its benevolent mandate, the Agency is also vested with the power to sue and be sued in its own name. N.J.S.A. 55:14K–5(a). The question before us is whether that provision interferes with a grant of tort immunity to the Agency as provided for by the Tort Claims Act, N.J.S.A. 59:1–1, *et seq.*

We believe that, generally speaking, because any State agency properly personified as a "public entity" under New Jersey law is entitled to the protective umbrella of the Tort Claims Act, *see, e.g., S.E.W. Friel Co. v. N.J. Turnpike Authority,* 73 N.J. 107, 113–18, 373 A.2d 364 (1977), and because the Agency meets this character-

ization, *A. Campo and Sons, Inc. v. Riccardi Building and Construction Co., Inc.,* slip op. No. A–134 81T2 (App.Div. March 28, 1983), the immunities of the Tort Claims Act appertain herein.

In a manner which roughly parallels traditional sovereign immunity, the Tort Claims Act provides immunity for discretionary acts of government as follows:

a. A public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity;

b. A public entity is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature;

c. A public entity is not liable for the exercise of discretion in determining whether to seek or whether to provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adequate governmental services;

d. A public entity is not liable for the exercise of discretion when, in the face of competing demands, it determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public entity was palpably unreasonable. Nothing in this section shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions.

N.J.S.A. 59:2–3. As the Comment accompanying this section makes irrefragably clear, subsections (a), (b) and (c) (but not necessarily subsection (d), *see* discussion, *infra*) were drafted to bestow broad and almost absolute immunity for the exercise of official judgment and discretion which are inherent in certain high-level policy decisions. *See* Comment Accompanying N.J. S.A. 59:2–3. The philosophical foundation for such expansive insulation from suit is essentially the theory that, as one court framed it, "it cannot be a tort for government to govern." *Amelchenko v. Free-*

*hold Borough*, 42 N.J. 541, 550, 201 A.2d 726 (1964) (citations omitted). What constitutes a "discretionary activity" is now well settled under New Jersey law.

As the New Jersey Supreme Court recently explained, "[a] discretionary act ... calls for the exercise of personal deliberations and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and *acting on them* in a way not specifically directed." *Kolitch v. Lindedahl,* 100 N.J. 485, 495, 497 A.2d 183 (1985) (emphasis in original) (quoting *Miree v. United States*, 490 F.Supp. 768, 774 (N.D.Ga 1980)). *See also Costa v. Josey*, 83 N.J. 49, 57–60, 415 A.2d 337 (1980). In setting forth its position as to why the Agency is liable to Berel in tort, Berel ironically argues persuasively that Agency decision-making during the course of enforcing the mandatory terms and conditions imposed by statute on Agency loans pursuant to N.J.S.A. 55:14K–7(a), (2) and (3) are discretionary acts:

> [T]he Agency was not a removed third party performing an isolated act in connection with the project in which it had no other involvement. The Agency loaned the money which financed the project; it reviewed and then approved the construction plans and schedules; it reviewed and approved, as well as disapproved, proposed change orders to the construction project; it provided inspectors for the projects who were present at the construction site on a weekly and sometimes daily basis; and its agency inspected and approved, as well as disapproved, the construction work.

Berel's Response To Agency's Reply Memorandum at 3.

The acts of reviewing and inspecting, as described by Berel themselves *supra*, followed by an ultimate conclusion manifesting itself in the form of "approval" or "disapproval" necessarily involves the exercise of personal deliberations and judgment

contemplated by the *Kolitch* court. The Agency must examine the facts culled from its direct observations of construction plans, construction schedules, change order proposals and the construction itself; reach reasoned conclusions concerning whether Agency approval or disapproval is warranted; and act on those conclusions by formally expressing its final decision on whether to grant its approval or disapproval. There is no strict formula or set of guidelines to be followed by the Agency in reaching its conclusions other than fulfilling its role as quasi-arbiter, as indicated in the contract Berel–Sencit Agreement at Provision 48,[17] which requires the Agency to execute its judgment within a general range of acceptable reason. During the process of extending loan monies on a day to day basis, the Agency must, at all times, bear in mind "the big picture," that is, the Legislature's desire to increase opportunities available to New Jersey residents for acquiring and enjoying safe and adequate housing.

However, the day to day planning for and mechanics of increasing such opportunities has been delegated to the wisdom of the Agency. In the Legislature's own words, the Agency is given *"considerable flexibility* in the types of financing and housing activities authorized." Statement Accompanying New Jersey Assembly Bill No. 3463 at 49 (introduced April 25, 1983) (emphasis supplied). By resolving questions of how best to allocate the public resources vested in it and by placing particular conditions on loans, the Agency is able to ensure that the policy goals of the Legislature are satisfied.

Yet in applying the broad brush of the Legislature's mandate to specific factual circumstances first, by choosing projects worthy of Agency money and second, by imposing certain custom-tailored conditions on the receipt of this funding,[18] the Agency too engages in policy judgments which are very real. It is indeed evident that

---

**17.** Provision 48 is set out in full and discussed in the contract theory portion of this opinion, *infra.*

**18.** *See, e.g.,* Mortgage Agreement § 8(c) at 6 which imposes, as a condition precedent to each

cash advance of Agency loan proceeds, the Agency's complete satisfaction with all work performed and materials furnished up to that point.

"[w]here there is room for policy judgment and decision there is discretion." *Dalehite v. United States*, 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953). For these reasons, we are satisfied that the Agency performed "discretionary acts" within the meaning of N.J.S.A. 59:2–3(a), (b) and (c). Thus, the Agency is entitled to the full immunity granted by subsections (a), (b) and (c) of Section 2–3 of the Tort Claims Act.

Consonant with the Tort Claims Act's "philosophy of limiting liability as to discretionary activities," several other provisions also serve to insulate the Agency from tort liability. *See* 35 M. Pane, *New Jersey Practice* § 591 at 234 (1987).

For instance, N.J.S.A. 59:2–5 states that: *A public entity is not liable for an injury caused by the issuance*, denial, suspension or revocation of, *or by the failure or refusal to issue*, deny, suspend or revoke, any permit, license, certificate, *approval*, order, or similar authorization, where the public entity or public employee is authorized by law to determine whether or not such authorization should be issued, denied, suspended or revoked (emphasis supplied).

N.J.S.A. 59:2–6 declares: *A public entity is not liable for injury caused by its failure to make an inspection*, or by reason of making an inadequate or negligence inspection of any property; provided, however, that nothing in this section shall exonerate a public entity from liability for negligence during the course of, but outside the scope of, any inspection conducted by it, nor shall this section exonerate a public entity from liability for failure to protect against a dangerous condition as provided in Chapter 4 (emphasis supplied).

And N.J.S.A. 59:4–6 provides:

a. Neither the public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of public property, either in its original construction or any improvement thereto, where such plan or design has been approved in advance of the construction or improvement by the Legislature or the governing body of a public entity or some other body or *a public employee exercising discretionary authority to give such approval* or where such plan or design is prepared in conformity with standards previously so approved (emphasis added).

We therefore conclude that Berel's claims based on mere negligence concerning Agency review, approval, inspection, planning, or design are barred by Sections 2–5, 2–6 and 4–6 of the Tort Claims Act, as set forth above. Thus, to the extent Berel's cause of action falls within the scope of these above provisions, summary judgment is granted to the Agency.[19]

However, unlike the almost absolute immunity enjoyed by the Agency for "discretionary acts" within the meaning of N.J.S.A. 59:2–3(a)–(c) and 59:2–5; 59:2–6 and 59:4–6, subsection (d) of this provision lends itself to a very limited judicial review based on a court's conclusion that the public entity's action or inaction was "palpably unreasonable." *See* N.J.S.A. 59:2–3(d) and accompanying Comment. *See also* 35 M. Pane, *New Jersey Practice* § 591 (1987).

What constitutes "palpably unreasonable" behavior has been made absolutely clear by the New Jersey Courts. In *Kolitch v. Lindedahl*, 100 N.J. 485, 497 A.2d 183 (1985), the New Jersey Supreme Court concluded that "the term implies behavior that is patently unacceptable under any given circumstance," *id.* at 493, 497 A.2d 183, and noted that before making such a deduction, "it must be manifest and obvious that no prudent person would approve of [the public entity's] course of action or inaction." *Id.* (*citing Polyard v. Terry*, 148 N.J.Super. 202, 216, 372 A.2d 378 (Law Div.1977)). The *Kolitch* Court glowingly endorsed a statement by the Appellate Division on this point, which declared *in toto:*

We conclude that the legislative intention [behind granting an exception to general governmental immunity where discre-

**19.** As explained earlier, *supra* note 8, the Agency moved to dismiss and we converted this motion *sua sponte* to one for summary judgment pursuant to Fed.R.Civ.P. 12(b).

tionary activities are "palpably unreasonable"] was to allow sufficient latitude for resourceful and imaginative management of public resources while affording relief to those injured because of capricious, arbitrary, whimsical or outrageous decisions.... We have no doubt that the duty of ordinary care, the breach of which is termed negligence, differs in degree from the duty to refrain from palpably unreasonable conduct. The latter standard implies a more obvious and manifest breach of duty and imposes a more onerous burden....

*Williams v. Phillipsburg,* 171 N.J.Super. 278, 286, 408 A.2d 827 (App.Div.1979) (*cited in part* in *Kolitch, supra* 100 N.J. at 493, 497 A.2d 183).

The burden of proof with respect to the reasonableness of a public entity's conduct undoubtedly rests with that entity. *Brown v. Brown,* 86 N.J. 565, 578–79, 432 A.2d 493 (1981). *See also Fox v. Township of Parsippany-Troy-Hills,* 199 N.J.Super. 82, 90, 488 A.2d 557 (App.Div.1985) ("the public entity bears the burden of demonstrating resource allocation immunity"); *Smith v. Nieves,* 197 N.J.Super. 609, 614, 485 A.2d 1066 (App.Div.1984) ("on a claim for [N.J.S. A. 59:2-3(d)] immunity the State has the burden of proving that in deciding among the many priorities its discretionary action was not palpably unreasonable."); *Longo v. Santoro,* 195 N.J.Super. 507, 518, 480 A.2d 934 (App.Div.1984).

Thus, to the extent Berel has been damaged by the Agency's withholding of approval on certain change orders (which are at the bottom of Berel's direct claims against the Agency), Berel has presented a prima facie claim sounding in tort, provided that such "action or inaction" may be characterized as constituting "palpably unreasonable" discretionary "action or inaction." We believe the Agency's decisions with respect to approval of change order proposals, requirements of additional work and changes in work and disbursement of loan proceeds involve precisely the type of high-level public entity resource allocation/discretion-laden decisions that the Legislature contemplated when they drafted N.J.S.A. 59:2-3(d).

Of course, the determination of "palpable unreasonableness" is within the exclusive province of the jury under New Jersey law. *See Rochinsky v. State of N.J. Dept. of Transp.,* 110 N.J. 399, 410 n. 5, 541 A.2d 1029 (1988). *See also Brown v. Brown, supra,* 86 N.J. at 580, 432 A.2d 493. Consequently the Agency's motion to dismiss all claims against it asserted by Berel is denied to the *very limited* extent that Berel shall have the opportunity to prove, before a jury and with the burden of proof on the Agency, that, in the exercise of its discretion, the Agency's "action or inaction" was palpably unreasonable within the meaning of N.J.S.A. 59:2-3(d).

■ Finally, the Agency has raised an alternative ground upon which we could rely in dismissing Berel's tort claims. The Agency alleges that Berel failed to comply with the notice provisions of the Tort Claims Act, N.J.S.A. 59:8-8 in instituting its claims against the Agency, which requires that a notice of claim be filed within 90 days of accrual of the cause of action. N.J.S.A. 59:8-8 states in relevant part:

A claim relating to a cause of action ... for injury to ... property shall be presented as provided in this chapter [N.J.S.A. 59:8-1 to 59:8-11] not later than the ninetieth day after accrual of the cause of action.

\* \* \* \* \* \*

The claimant shall be forever barred from recovering against a public entity if:

a. He failed to file his claim with the public entity within 90 days of accrual of his claim except as otherwise provided in section 59:8-9; or

b. Two years have elapsed since accrual of the claim;

Subsection a. references N.J.S.A. 59:8-9, which provides that:

A claimant who fails to file notice of his claim within 90 days as provided in section 59:8-8 of this act, may, in the discretion of a judge of the superior court, be permitted to file such notice at any time within 1 year after the accrual of his

claim provided that the public entity has not been substantially prejudiced thereby. Application to the court for permission to file a late notice of claim shall be made upon motion based upon affidavits showing sufficient reasons for his failure to file notice of claim within the period of time prescribed by section 59:8–8 of this act; provided that in no event may any suit against a public entity arising under this act be filed later than 2 years from the time of the accrual of the claim.

That Berel's complaint stating its cause of action against Sencit and delineating the time of accrual of its action against the Agency was filed on August 20, 1986 is uncontroverted. Similarly not in issue is the fact that Berel did not file its direct claim against the Agency until August 31, 1987, more than one year after its claims accrued. Finally, also undisputed is the fact that the Agency had a representative at the site during all or nearly all of the time of construction. What is in dispute, however, is whether certain letters sent by Berel to the Agency were sufficient to put the Agency on notice, such that Berel substantially complied with the requirements of N.J.S.A. 59:8–1 *et seq.*

After carefully reviewing the documents submitted by Berel, we find that they provided substantial compliance with the notice requirements found in N.J.S.A. 59:8–4, which specifically requires that a claim shall include:

 a. The name and post office address of the claimant;

 b. The post-office address to which the person presenting the claim desires notices to be sent;

 c. The date, place and other circumstances of the occurrence or transaction which give rise to the claim asserted;

 d. A general description of the injury, damage or loss incurred so far as it may be known at the time of presentation of the claim;

 e. The name or names of the public entity, employee or employees causing the injury, damage, or loss, if known; and

 f. The amount claimed as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed.

The Agency urges a stringent, rigid interpretation of N.J.S.A. 59:8–9, however, we take a more liberal position. We find that because 59:8–9 itself contains a cure provision, and the New Jersey Courts have sought only substantial and not complete compliance, *see, e.g., Guerrero v. City of Newark*, 216 N.J.Super. 66, 522 A.2d 1036 (App.Div.1987), that literal formalism is not warranted in this instance.

Berel suggests that a certain letter of April 3, 1986 from Richard M. Schlaifer, Esquire, on behalf of Berel to Mr. Godfrey at the Agency, (attached as Exhibit D to the Memorandum of Berel Company In Opposition) substantially meets the above requirements. That letter, however, demands that the Agency start the administrative process of arbitrating the disputes between Berel and Sencit and Berel and Sullivan, but says nothing about the Agency's action or inaction in its inspection or approval capacities. However, certain other letters submitted by Berel as proof of notice (attached as Exhibit C to the Memorandum of Berel Company In Opposition) which often dispute a denial of approval by Sullivan when coupled with the fact that the Agency had a representative on site, give enough of the data required by N.J.S.A. 59:8–4 to give the Agency sufficient notice.

Some of Berel's documents approach the level of substantial compliance the court held to exist in *Guerrero, supra.* In *Guerrero*, it was found that Mr. Guerrero had substantially complied with the notice provisions of the Tort Claims Act by notifying the City of Newark in a letter containing the following information: plaintiff's name and address; date, time, place and alleged cause of the accident (an inoperative traffic light); that injuries were allegedly suffered by plaintiff, but to an unknown extent; the particular public entity

allegedly responsible for his injuries; and that medical expenses had been incurred, but to an unknown extent. *Id.* at 70–71, 522 A.2d 1036.

Certain of Berel's letters include the date, time, place and alleged cause of injury, (in the form of unapproved change order proposals) as well as an estimation of the extent and/or type of injuries suffered (in the form of amounts due for work already completed) and a general description of what relief was being requested. Although some of Berel's letters are more akin to the defective notice given in *Navarro v. Rodriguez*, 202 N.J.Super. 520, 495 A.2d 476 (Law Div.1984), where the court found that "[t]he doctrine of substantial compliance cannot cure the total omission of an essential element from a claim ..." *id.* at 530, 495 A.2d 476, the Agency need only be put on notice of the problem, and not all of the letters need to satisfy the statutory requirement. Coupled with the fact that the Agency had a representative on site, we feel that the Agency received notice, at least constructively, of Berel's tort claim of palpably unreasonable delay.

We therefore grant summary judgment to the Agency on Berel's complaint under N.J.S.A. 59:2–3(a), (b), (c), 59:2–5, 59:2–6 and 59:4–6 on the ground that the Agency is immune under those provisions, however, we deny the Agency relief to the extent that Berel states a claim of "palpably unreasonable" conduct on the part of the Agency, under N.J.S.A. 59:2–3(d).

### B. *Sullivan vs. The Agency*

Sullivan's direct claims against the Agency seek full indemnification for any and all sums that are ultimately adjudged against Sullivan in favor of either Berel and/or Sencit. In support of its position, Sullivan proffers the theory that, essentially, should it be found liable to either Berel or Sencit, such liability is a result of the tortious negligence of the Agency or the Agency's commission of breaches of contract. We shall first examine the applicability of the Tort Claims Act, N.J.S.A. 59:1–1 *et seq.*, and then explore whether or not an agreement exists upon which the Agency could be liable to Sullivan.

### 1. The New Jersey Tort Claims Act

 We believe that the provisions of the Tort Claims Act discussed *supra* (N.J.S.A. 59:2–3, 59:2–5 and 59:2–6) apply with equal force with respect to Sullivan as they did with Berel. Because the Agency's actions vis a vis Sullivan involve the very same issues concerning discretion, review and inspection, a critical examination of Sullivan's allegations of Agency negligence would be superfluous to our conclusion with respect to limited Agency tort immunity, and the narrow scope of "palpable unreasonableness" upon which Sullivan may rest its claim.

Although the Agency zealously asserted that the notice provisions of the Tort Claims Act (requiring that a notice of claim be filed within 90 days after the cause of action accrues) provided a possible ground for dismissal against Berel's tort claims, *see supra*, where we found constructive notice to exist, Berel points out that the Agency essentially *concedes* having received proper notice of Sullivan's fourth party complaint despite Sullivan's failure to file a timely notice of claim. The Agency has properly read New Jersey law which holds that the notice provisions of the Tort claims Act do not apply to third party practice. *See, e.g., Speer v. Armstrong*, 168 N.J.Super. 251, 256–57, 402 A.2d 963 (App. Div.1979). Unfortunately, our view that Sullivan need not have filed a timely notice of claim does nothing to help overcome the substantial hurdle of "palpable unreasonableness" which Sullivan will ultimately have to show once the Agency has met the initial burden of proof. *See, e.g., Brown*, 86 N.J. at 578, 432 A.2d 493, *supra*.

Thus, although we find that Sullivan need not have filed a timely notice of claim, we grant summary judgment to the Agency on Sullivan's fourth party complaint pursuant to N.J.S.A. 59:2–3(a), (b), (c), 59:2–5, 59:2–6 and 59:4–6 on the ground that the Agency is immune under those provisions, however, we deny the Agency relief to the extent that Sullivan's complaint pleads that the discretionary "action or inaction" (which is to be determined by the jury) was "palpably unreasonable" pursuant to N.J.S.

A. 59:2–3(d), and the case law construing it, discussed *supra*.

### 2. Alleged Breach of Contract

Sullivan also alleges that the Agency either breached a direct agreement between it and Sullivan, or that Sullivan was a third party beneficiary to one or more of the five Sencit–Agency Agreements. All of the same reasons we relied on to find that Berel was not a third party beneficiary apply with equally compelling force to characterize Sullivan as a mere incidental beneficiary.

■ The direct contract approach of Sullivan, however, unlike the situation with Berel, compels us to search further to determine whether Sullivan may have a valid breach of contract claim. The major difference between the Sencit–Sullivan Agreement [20] and the Berel–Sencit Agreement is the blatant omission in the former of a disassociation clause such as Article 3 in the latter, removing the Agency from being a party to the Agreement. Specifically, Article 5, *Miscellaneous Requirements*, Provision 5.6, *Disputes*, states that:

> In the event of dispute arising under this Contract, the Architect shall notify the sponsor and HMFA promptly in writing of his contentions and shall submit his claim. If the dispute arises before performance of the related work, the written notice shall be submitted prior to commencing such work. In any event, the Architect shall proceed with his work hereunder in compliance with the instructions of the HMFA, but such compliance shall not be a waiver of the Architect's right to make a claim, provided he has notified the sponsor and HMFA in writing as above stipulated.

**20.** The Sencit–Sullivan Agreement is entitled "State of New Jersey, Housing and Mortgage Finance Agency *Contract For Architectural Services* For moderate-income housing developments to be constructed under the New Jersey Housing finance Agency Law, Chapter 81 of the Laws of 1967." (emphasis in original) To the extent that the Agency not only drafted, but also named itself in this Agreement in the title, our previous determination that merely drafting an

The omission of a disassociation clause and the inclusion of this provision satisfy us that a genuine issue of material fact exists as to whether the Agency is liable to Sullivan for breach of the Sullivan–Sencit Agreement. *See* Fed.R.Civ.P. 56(c). Therefore, we deny the Agency's motion for summary judgment against Sullivan and allow Sullivan to proceed at trial on two theories, first on the theory that the Agency's conduct was "palpably unreasonable"; and secondly that the Agency breached an agreement between itself and Sullivan which is contained in Provision 5.6 of the Sullivan–Sencit Agreement.

### IV. BEREL'S MOTION FOR PARTIAL SUMMARY JUDGMENT

■ Berel claims that certain change orders were approved by all parties required by the Berel–Sencit Agreement, therefore partial summary judgment as to the amount already approved should be granted. There is no dispute that the requisite approvals were obtained, nor is there any question that Berel is owed a sum certain on the work it performed. Sencit puts forward two defenses. First, Sencit claims that it need not pay Berel what is owed now, because Sencit has made counterclaims for sums larger than what Berel is owed and eventually may recover from Berel. Second, Sencit claims that Sullivan and the engineers retained by Sullivan necessitated the changed work done by Berel, and that therefore Sullivan, Gamble and Nardy, not Sencit, should be held responsible for the amount owed on the change orders. Neither defense is sustainable.

At a meeting between Berel, Sencit, Sullivan and the Agency held at the Agency offices in Trenton, New Jersey on May 21, 1986,[21] the following change order proposals were fully approved:

agreement does not *ipso facto* make one a party to the agreement, is inapplicable.

**21.** This meeting is fully documented in a letter dated June 24, 1986 ("June 24 letter") which is on Agency letterhead and signed by Robert H. Lee, AIA, Director of Technical Services. The letter purports to summarize the meeting held on May 21, 1986. No party has asserted that the document is not what it claims to be, and it appears to be within the provision for self-authenticating documents. *See* Fed.R.Evid.

| CO # P–8 | Light Weight Fill | Approved for $10,617.00 |
|---|---|---|
| CO # P–11 | Face Brick | Approved for $20,141.32 |
| CO # P–25 | Repaving Tennessee Avenue for Storm Sewer Drain | Approved for $15,939.00 |
| CO # P–26 | Broken sewer Main on Absecon Blvd. & Tennessee Avenue | Approved for $1,742.73 |
| CO # P–29 | Additional Hose Bibs | Approved for $7,713.64 |
| CO # P–32 | Bell Telephone Company Conduit | Approved for $2,325.40 |
| CO # P–45 | (Unknown) | Approved for $5,610.00 |
| CO # P–46 | Additional Concrete Steps | Approved for $3,038.11 |
| CO # P–49 | Replacement of Broken Windows | Approved for $10,152.00 |
| | | Total: $77,279.20 |

Berel claims that the Agency also approved CO# P–47 before the May 21, 1986 meeting in the amount of $6,930.00. By our calculation, there appears to be a potential total of $84,209.20 worth of change orders that have been fully approved and are due and owing to Berel (the $77,279.20 evidenced by the June 24, 1986 Letter and the $6,930.00 allegedly approved before the May 21, 1986 meeting). In addition, again by our own calculation, there remains somewhere between $1,464,580.90 and $1,616,418.28 claimed by Berel for change order proposals that were rejected by one or more parties. For the disposition of this motion, however, we are only concerned with the approved change orders and whether summary judgment should be granted as to those change orders only.

The parameters are well-defined as to when a court can grant summary judgment. According to Fed.R.Civ.P. 56(c), summary judgment is to be granted only in cases where there exists no genuine issue of material fact. We believe that on the question of the change orders approved by all parties there is no genuine issue of material fact and therefore grant Berel partial summary judgment as against Sencit for the $84,209.20 for which competent evidence of the requisite approval exists, less the credits indicated in the June 24 Letter, for a total of $75,685.20.

The way we read the June 24 Letter, the $77,279.20 worth of change orders approved was subject to seventeen itemized credits outlined in a memo dated March 19, 1986 by Sullivan and response memo by Berel dated May 12, 1986. These credits total $8,524.00, leaving the total amount approved and owing from this document at $68,750.20. This figure is then combined with the $6,930.00 approved previously by the Agency, as indicated by the deposition testimony of Ken Smith, a principal of Sencit, attached as Exhibit C of Berel's Brief

902(2). Therefore, we shall rely on this document as an accurate account of what transpired at the May 21, 1986 meeting in deciding this motion for partial summary judgment. The document in question is attached as Exhibit B to Berel's Memorandum in Support of its Motion.

in Support, at 219:15–25, 220:1–13.[22] Therefore a total of $75,685.20 is not in dispute and summary judgment shall be granted as to this amount.

We agree with Berel that regardless of whether potential counterclaims or set-offs are outstanding, summary judgment is still proper. *See, e.g., Electro–Catheter Corp. v. Surgical Specialties Instrument Co., Inc.,* 587 F.Supp. 1446, 1456–57 (D.N.J. 1984). We also agree with Sencit, however, that it is proper to stay the enforcement of such a judgment pursuant to Fed. R.Civ.P. 54(b) until all of the remaining claims between the parties have also been adjudicated. *Electro–Catheter, supra,* at 1457.

■ Berel has also moved for partial summary judgment on certain other change order proposals, which were not approved by Sencit and Sullivan, but which were approved and then held in abeyance by the Agency. Specifically, Berel claims that partial summary judgment is also in order with respect to CO# P–30 (Revised) *Cold Air Returns* (proposed cost: $174,-163.51) and CO# P–35 *Additional Structural Pinning,* (proposed cost: $57,381.59), (*see* Exhibit E to Berel's Brief in Support) for a total of $231,545.10, because the Agency approved these change orders and Sencit has conceded (via its expert report) that the excess work was caused by Sullivan's negligence, faulty work and breach of contract. The test for summary judgment, however, says nothing about who raises the issue, and we feel Sullivan's, Gamble's and Nardy's protestations to the Court are sufficient to raise a genuine issue of material fact concerning who was negligent: (a) Sullivan, Gamble and Nardy, as Berel claims, or (b) Berel for failure to build to specifications and for unauthorized substitution of building materials which caused the need for the structural changes, as Sullivan, Gamble and Nardy claim. More specifically, we are constrained by the Supreme Court's mandate that:

[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.... The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The trial briefs in this case submitted by Berel, Sullivan, Nardy and Gamble point to only one conclusion—that a genuine issue of material fact remains over whether Sullivan negligently designed or Berel negligently constructed. Summary judgment is therefore improper, and is denied on change orders CO# P–30 and CO# P–35.

■ Finally, Berel seeks pre-judgment interest on the amounts it ultimately receives in partial summary judgment. Pre-judgment interest is substantive for Erie Doctrine purposes, and therefore is controlled by the law of the State in which we sit. *See, e.g., Zippertubing Co. v. Teleflex, Inc.,* 757 F.2d 1401, 1414 (3d Cir.1985). The firmly established controlling principle in New Jersey law is that pre-judgment interest is allowed at the discretion of the Court, in accordance with equitable principles, regardless of the liquidated or unliquidated nature of the claim. *See Manning Engineering, Inc. v. Hudson County Park Commission,* 71 N.J. 145, 159, 364 A.2d 1 (1976); *Bak–A–Lum Corporation of America v. Alcoa Building Products, Inc.,* 69 N.J. 123, 131, 351 A.2d 349 (1976); *Board of Education of City of Newark, Essex County v. Levitt,* 197 N.J.Super. 239, 244, 484 A.2d 723 (App.Div.1984).

We believe that equitable principles demand the denial of Berel's request for pre-judgment interest. There are substantial

---

**22.** 219:15–25 refers to the page of the deposition followed by the pertinent lines found on that page.

counterclaims and direct claims by Sencit and Sullivan against Berel, and liability for wrongdoing has not yet been fully ascribed to any party, thus making pre-judgment interest premature at this time. Where so many issues remain outstanding, i.e. concerning which party was actually negligent, if anyone, who breached the agreement first, and what is actually owing after all the claims, cross-claims and counterclaims are finally resolved, the prudent and wise course is to deny pre-judgment interest to any party.

## V. CONCLUSION

On the basis of the foregoing analysis, we have determined that the Agency's motions for summary judgment be granted in part and denied in part. With respect to Berel, the Agency's motion is granted on the contract theory and granted in part on the tort theory. It is denied to the extent that Berel claims the Agency's conduct was "palpably unreasonable" and therefore waived its immunity under the Tort Claims Act.

With respect to Sullivan, the Agency's motion is granted on the third party beneficiary theory, but denied on the direct contract claim to the extent that Sullivan claims in reliance on the Sullivan–Sencit Agreement. The Agency's motion is also granted in part on tort theory, again denied to the extent that Sullivan claims that the Agency's conduct was "palpably unreasonable" and therefore waived its immunity under the Tort Claims Act.

Finally, Berel's motion for partial summary judgment is granted in part and denied in part. For the amounts approved by all parties on May 21, 1986 at the Agency meeting, Berel is owed $75,685.20 concerning which no genuine issue of material fact exists, and therefore summary judgment is proper. Concerning change order proposals 30 and 35, in an amount of $231,545.10, we believe a genuine issue of material fact over which party, the contractor or the architect (including his engineers) was at fault for the resultant problems which necessitated correction. Obviously we cannot substitute our opinion of which party is in

the wrong for a jury decision of the matter, and therefore summary judgment is denied.

An appropriate Order shall be entered in conformity with the Opinion of this Court.

## ORDER

This matter having come before the Court on a motion by the New Jersey Housing and Finance Agency ("Agency") for summary judgment as against the Berel Company ("Berel") and as against Sullivan Arfaa, P.C. ("Sullivan"), pursuant to Fed.R.Civ.R. 56 and, on a motion by Berel for partial summary judgment as against Sencit F/G McKinley Associates ("Sencit") pursuant to Fed.R.Civ.P. 56; and

For the reasons set forth in the Court's opinion filed this day; and

For good cause shown;

It is on this 3rd day of March, 1989 ORDERED that the motion by the Agency as against Berel be and the same is hereby GRANTED IN PART AND DENIED IN PART. Berel shall be permitted to pursue its cause of action based on a tort theory of "palpable unreasonableness" of Agency "action or inaction"; and

IT IS FURTHER ORDERED that said motion by the Agency as against Sullivan be and the same is hereby GRANTED IN PART and DENIED IN PART. Sullivan shall be permitted to pursue its direct contract cause of action and tort cause of action based on a theory of "palpable unreasonableness" of Agency "action or inaction"; and

IT IS FURTHER ORDERED that said motion by Berel as against Sencit is GRANTED IN PART and DENIED IN PART as fully delineated in our Opinion entered this day; and

IT IS FURTHER ORDERED that judgment on said motion by Berel as against Sencit GRANTED this day shall be STAYED under Fed., R.Civ.P. 54(b) until the final resolution by the Court of all claims of all parties; and

IT IS FURTHER ORDERED that Berel's motion as against Sencit for pre-judg-

ment interest be and the same is hereby DENIED.